# TRAVEL OF THE CASE

Indictment Number P1/01-3914AG was filed in the Superior Court of Providence County, Rhode Island on December 7, 2001, charging the petitioner, Eddie Linde, with seventeen different offenses: Count 1 – the first degree murder of Randy Silas, in violation of R.I.G.L. § 11-23-1; Counts 2, 6, 9, 11, 13, and 15 – using a firearm while committing a crime of violence, in violation of R.I.G.L. § 11-47-3.2(a); Counts 3 and 7 – discharging a firearm while committing a crime of violence, in violation of R.I.G.L. § 11-47-3.2(b); Count 4 – assault with intent to murder Daniel Mosley, in violation of R.I.G.L. § 11-5-1; Counts 5, 8, 10, 12, and 14 – felony assault, in violation of R.I.G.L. § 11-5-2; Count 16 – carrying a pistol without a license, in contravention of R.I.G.L. § 11-47-8(a); and Count 17 – larceny of a firearm in violation of R.I.G.L. § 11-47-5.1.

After criticizing the state for "overcharg[ing] this case" in a "convoluted way," a practice with which the court took a "dim view," Justice Krause was prepared to dismiss several counts *sua sponte* as "multiplicitous." TR I 81, 87, 94. Instead of outright dismissal by the court of these duplicative counts, the state alternatively suggested that those counts be dismissed pursuant to R.I. Rule Crim. Pro. 48(a). *See generally* TR I 80-89, 94. Accordingly, Counts 2, 5, 6, 12, 13, and 17 were dismissed under Rule 48(a).

After pretrial motions were heard and decided by Mr. Justice Krause on May 17, 2002, Mr. Linde was tried by a jury on the remaining eleven counts, with Justice Krause presiding, on May 23-24 and May 28-29, 2002. On May 29, 2002, the jury returned not guilty verdicts on Count 14 (felony assault of Robert Loya), and Count 15 (use of a firearm while committing a crime of violence against Robert Loya). However, the jury returned guilty verdicts on the remaining nine counts:

Count 1 – the second-degree murder of Randy Silas (as a lesser-included offense of murder in the first degree);

Count 2 – discharging a firearm while committing a crime of violence against Randy Silas;

Count 4 – assault with intent to murder Daniel Mosley;

Count 7 – using a firearm while committing a violent crime against Daniel Mosley;

Counts 8 and 10 – felony assault against Richard Amon and Frank Parillo, respectively;

Counts 9 and 11 – using a firearm while committing a violent crime against Richard Amon and Frank Parillo, respectively;

Count 16 – carrying a pistol without a license.

Mr. Linde's motion for a new trial was heard and denied on June 5, 2002. On October 1, 2002, Justice Krause sentenced Mr. Linde as follows: Count 1 – the second degree murder of Randy Silas, 40 years with 20 years to serve; Count 3 – discharging a firearm while committing a crime of violence against Randy Silas, mandatory life consecutive to Count 1; Count 4 – assault with intent to murder Daniel Mosley, 10 years, 5 to serve; Count 7 – discharging a firearm while committing a crime of violence against Daniel Mosley, 10 years suspended and probation, consecutive to Count 4; Count 8 – felony assault against Richard Amon, 10 years, 1 to serve; Count 9 – using a firearm while committing a crime of violence against Richard Amon, 10 years suspended and probation consecutive to Count 8; Count 10 – felony assault against Frank Parillo, 10 years, 1 to serve; Count 11 – using a firearm while committing a crime of violence

against Frank Parillo, 10 years suspended and probation, consecutive to Count 10; and Count 16 – carrying a pistol without a license, 10 years, 1 to serve. All sentences were deemed to run concurrently, except where otherwise noted. All totaled, Mr. Linde is required to serve an aggregate sentence of life plus 20 years. While testifying and while exercising his right of allocution, Mr. Linde accepted fault for his actions and expressed extreme remorse. TR II 463-67. The trial justice, in turn, acknowledging that Mr. Linde was a hard-working family man with "legions of friends," stated, "I think this is probably the most difficult sentencing I have ever had to confront." TR II 468. He further stated that the court felt "trapped" by the mandatory consecutive life sentence on Count 3. *Id.*

A notice of appeal to the Rhode Island Supreme Court was timely filed on October 7, 2002. Attorney Paul J. DiMaio, hired by the Linde family to represent Mr. Linde at trial, withdrew two days later. The RI Office of the Public Defender thereafter entered an appearance for purposes of appeal. The case was docketed with the Clerk of the Supreme Court on June 27, 2003. Mr. Linde's direct appeal was denied and dismissed on July 7, 2005. Mr. Justice Krause, upon Mr. Linde's motion, later reduced the murder sentence to ten years to serve. Mr. Linde thereafter filed an Application for Post-Conviction Relief in Providence Superior Court, which Application is still pending.

# STATEMENT OF FACTS

In this tragic case, members of an out-of-state construction crew, all of whom were in Rhode Island to build the Ocean State Baptist Church in Smithfield, demonstrated anew that anger, alcohol, and guns can often be a lethal combination. Eddie Linde, age forty-four at the time of the incident on October 23, 2001, took the stand to testify on his own behalf at trial. Mr. Linde, a successful member of the ironworkers' union for twenty-six years and a native of Florida, met the decedent, fellow Floridian Randy Silas, through a mutual friend about a month before coming to Rhode Island with him. Trial Transcript [hereinafter "TR"] IV 32-33. Randy Silas, the head of a small ironworkers' company, had just fired his entire crew for stealing from him and was in the process of re-assembling another crew to perform the subcontracting work on the church in Smithfield. TR IV 33. Mr. Linde agreed to join Randy Silas's non-union crew (paying lower-than-union wages) only because Silas agreed to let Mr. Linde's son, Michael Linde, and Michael's friend, Shane Roberts, to work alongside the other ironworkers in order to learn their trade. TR IV 33, 74. Both of the young men, who had recently finished four years of military service in the United States Marine Corps, were having trouble finding decent, lucrative jobs. TR IV 33. Randy Silas agreed with Mr. Linde's proposal, and told Mr. Linde to bring the boys along if he would agree to be the certified welder on the project. TR IV 34.

Therefore, a crew of five men, with Randy Silas as the foreman, came to Rhode Island a couple of weeks before the incident and started to build the iron substructure of the church. TR III 138; TR IV 34-35. Silas rented three rooms at the Susse Chalet in Smithfield; Randy Silas roomed alone at first, Eddie Linde shared a room with his son's

friend, Shane Roberts, and Michael Linde shared a room with another worker, Kent Holton. TR IV 35. All of the men got along well with Randy Silas and with each other. TR IV 35. Michael Linde said he often worked alongside Kent and Randy Silas, learning his new trade. TR IV 7. Michael's father, Eddie Linde, and Silas were very friendly toward one another. TR IV 7.

The period of happy industriousness came to an abrupt halt when Danny Mosley joined the crew on October 20th, a couple of days before the incident. TR II 164, 187. Danny Mosley admitted that he developed an immediate dislike for Eddie Linde. TR II 189. Mr. Linde thought that Mosley was antagonistic toward him because he was a union member whereas Mosley was not. TR IV 37. Mosley acted, testified Mr. Linde, like he <u>wanted</u> to pick a fight with him. TR IV 38. Though the men had been on the job for some time, Mr. Linde felt that Mosley wanted to take over; Randy Silas, in turn, seemed somewhat intimidated by Mosley and stayed out of his way. TR IV 37.

On October 23, 2001, Danny Mosley's second day on the job, the tension escalated and trouble developed between Mosley and Mr. Linde. Mosley's version of events was that Mr. Linde was an incompetent structural welder and "a belligerent fellow" who was not performing his job adequately. TR II 167. Mosley said that Eddie Linde flew into a rage after he had picked up Linde's shirt and it "accidentally" got wet. TR II 167. Mosley alleged that when Mr. Linde started "cussin' and mumbling and ... stepped up to my face," TR III 168, he shoved him back. He said, "I was pretty much going to beat the heck out of him, and Randy and another fellow grabbed me ... and restrained me from beating him ... ." After the fight, Mr. Linde "stuck his hand out ... to shake my hand," whereupon Mosley went back to work. TR II 168.

Eddie Linde testified, as he had related in his statements, that he spent an enormously frustrating day on the job in the hours preceding the fight. That day, Randy Silas had asked him to weld steel sheets of decking to girds underneath the joists. When a worker lays decking, Mr. Linde explained, the steel sheets must be measured and marked accurately since the welder cannot see the joists underneath. Because Danny Mosley had marked each piece inaccurately (albeit purposefully or negligently), Mr. Linde kept burning useless holes in the decking material. TR IV 39. Five hours of needing to pick-up, move, and re-mark each sheet slowed him down and upset him, and he candidly admitted complaining and cussing. TR IV 39, 40, 65, 69, 99. Another episode of post-playground bullying occurred when Mr. Linde's welding shirt ended up in a puddle. When he asked who had put it there, Mosley "came up screaming he put it there" and threatened, "if I didn't like it he would stomp my butt." TR IV 69-70. Mr. Linde further testified that when Danny Mosley jumped at him and pushed him in the face, he fought back. TR IV 40. The younger Danny Mosley, however, threw Mr. Linde to the ground and injured his knee; Mr. Linde identified the injury as a torn ligament since he previously had five surgeries for that debilitating problem on his other knee. TR IV 41.

After the fight, Mr. Linde testified, "I was hurt awful bad," and thus went back to the motel to rest and seek medical assistance with the hope of returning to the job very soon. TR IV 42, 68. After appearing at the construction site a couple of times that afternoon to inquire about medical coverage, he determined that his own personal medical plan would have to cover the charges since Randy Silas did not carry workers' compensation insurance. TR IV 41, 42, 68, 71. Yet, Mr. Linde swore, he was not angry

at Randy Silas since Randy was treating him and his son very well. TR IV 43, 71. Their relationship remained a positive one. TR IV 35, 38.

Michael Linde substantially corroborated his father's version of events *vis-à-vis* the fight. *See generally* TR IV 11-13. Michael testified that his father threw a punch only after Danny Mosley shoved him in the face. TR IV 11, 26. Basically, Michael said, the two men locked together and fell to the deck until Randy and Kent pulled them apart. TR IV 12, 26. The general contractor's superintendent on the job, Donald Martin of Kodiak Construction, testified that he thought everything was fine after the two wrestlers were separated and shook hands. TR II 142, 146-47. Neither Michael nor Donald Martin was present at the shooting later that day.

All alone at the motel that afternoon and evening, Mr. Linde, in a nutshell, told the clerk about the fight and the resulting injuries, filed a complaint with the police upon the clerk's suggestion,[1] tried to obtain the appropriate insurance information from his wife in Florida, and futilely attempted to find a way to get medical treatment. TR II 227-29 (desk clerk's testimony); TR III 293, 296-97 (police officer's testimony); TR IV 42-44 (Mr. Linde's testimony). The motel clerk, Frank Parillo, testified that despite Mr. Linde's pronounced limp and apparent pain, Mr. Linde was nonetheless soft-spoken and gentlemanly and "seemed very resigned to the fact that he got hurt. He wasn't resentful. He did seem mellow, if anything." TR II 232. Eddie Linde testified that his only post-injury goal that day was obtaining medical treatment at the hospital and some relief from his pain. TR IV 45.

---

[1] Patrolman Lisa St. Angelo, after speaking to Mr. Linde and Danny Mosley, concluded that she would charge both men if Mr. Linde pursued his complaint. TR III 297-98.

While hanging around in his motel room for many hours until his co-workers' return at 10 p.m., Mr. Linde started "self-medicating" with the large stash of liquor that the men had purchased the night before in anticipation of their weekend revelry. Though he never drank hard liquor, he finished off two bottles of vodka and drank 12pk of Smirnoff malt liquor. TR IV 46. As he searched for more alcohol, he found his roommate's gun in the nightstand drawer. TR IV 47. On Officer St. Angelo's early evening trip to the Susse Chalet to speak to Mr. Linde again, she noticed, even then, that "he was acting a little out of the ordinary." TR III 316. His pupils were so large and his actions were so strange, that she asked him if he was on drugs or medication. TR III 316. She elaborated, "He seemed a little dazed, that is why I asked." TR III 317.

Upon the crew's return from the job site at 10 p.m., a highly intoxicated Eddie Linde found his way down to the parking lot, carrying Shane's gun so that Danny Mosley would stay away from him. TR IV 47. His only goal was to have his son take him to the hospital. TR IV 47. When Randy Silas and Danny Mosley pulled up in Silas' truck, Mr. Linde told Silas that he wanted to go to the hospital. Silas replied that the boys would be arriving shortly and asked him what he was doing with the gun. TR IV 48, 50. Mr. Linde told Silas that he wasn't going to let Danny jump him again. TR IV 50. Mr. Linde testified that Randy Silas responded with something like, "You don't need that," and promised to take him to the hospital. TR IV 90. At that point, Mr. Linde testified, Mosley came around the side of the truck and set his food bags on the back of the truck (where they were later found by the B.C.I. detectives). TR IV 50. It also looked to Mr. Linde like Danny Mosley was carrying Randy's black bag – the one in which Randy stored his guns. TR IV 51.

---

TR I 10, 21,22 Two bottles of hard liquor and 12pk of Smirnoff Ice. Witness statement.

Mr. Linde's fears were magnified when Mosley "said something about a gun," and told Mr. Linde "it could have been my neck." TR IV 51. Mr. Linde directly faced Mosley, with Randy Silas on the left behind him, "more or less in my blind spot." TR IV 51-52. Mr. Linde explained his reaction:

> I figured he might be going around with the gun in that bag so I pulled the gun and I cocked it and when I cocked it, I almost dropped it. When I gained control of it again, I grabbed it, and a round shot off.

TR IV 51. Mr. Linde said that although he had not intended to shoot Randy Silas or *anybody*, he realized, to his horror, that he had accidentally shot Randy. TR IV 52-53.

Danny Mosley, the only eyewitness to the shooting since the young men had not yet arrived at the motel, said he exited Randy's truck with his groceries and Randy's black bag. TR II 174. Mosley said that when he spied the gun, he exclaimed, "Damn, it ain't that bad, is it?" TR II 175. Mosley said that Mr. Linde's eyes were riveted on him the entire time and he "came up and stuck the gun directly in my face." TR II 175. As two or three shots were fired, Mosley said, he ran away, first hiding behind a white truck and then "head[ing] for the darkness of the trees." TR II 176. When he emerged, he found Randy Silas' body and called 9-1-1. TR II 181-82.

Despite other witnesses' testimony to the contrary (*see generally* TR II 218-225 [testimony of guest Richard Amon, Jr.] and TR II 233, 235, 241-42 [testimony of desk clerk Frank Parillo]), Mr. Linde said he did not remember going back into the motel lobby following the shooting. TR IV 54, 83, 94. Rather, when he saw Danny Mosley rooting around in Randy's black gun bag, he walked to the front of the motel, heading toward the street, limping and crying. TR IV 36, 53-55. On the way, he recalled, he encountered a man and a woman in front of the motel, fired a shot to the ground to prove

to the disbelieving woman that the gun was real, assured the two that he would not hurt them, and voluntarily relinquished the gun to the man. TR IV 53-55, 94-95. *See generally* TR II 123-35 (testimony of Robert Loya regarding this encounter).

Although Mr. Linde said he walked into the street in front of the motel, and the male bystander in front of the motel said he saw Mr. Linde limp off into the woods across from the motel, TR II 128; TR IV 53, Mosley claimed, in contrast, that Mr. Linde came back around into the parking lot from the front of the motel and then walked into the woods. TR II 183-84. At one point, Mr. Linde testified, he saw the police drive by, and later fell down into a water-filled ditch and got soaking wet. TR IV 55. Patrolman Robert Squillante peaceably apprehended Mr. Linde several hours after the incident in the CVS parking lot on Douglas Pike. TR IV 285-86.

Randy Silas had expired by the time that the police arrived. TR II 259.[2] The police immediately secured the area and extensively searched the crime scene as well as the surrounding area – including cars, the woods, dumpsters, and tractor-trailers. TR II 251; TR III 300. Though Danny Mosley claimed to have left the black bag he was toting "in the shadows" (and went back to retrieve it the next day), TR II 196, the police did not find it in their search. TR II 253-54. Among other items, the police seized a holster from under Mr. Linde's mattress (*see* Issue I), empty liquor bottles from his motel room, and an unzipped green bag lying near the decedent's body. The green bag contained a number of prescription bottles, a crack pipe, some tools, live .380 mm automatic rounds,

[2] The medical examiner testified that he died as a result of a single gunshot wound to the front of his chest, which injured his aorta, spine and spinal cord, before exiting out his back. TR II 157-58. The manner of death, she opined, was homicide. TR II 160. The ballistics expert concluded that the .9 mm bullet which killed Randy Silas was fired from the firearm that was handed to the bystander in front of the motel moments after the shooting. TR III 439-40.

and the butt end of a loaded gun sticking out of the bag in plain view. TR II 274-75; TR III 394.

Immediately following Mr. Linde's arrest, the police interrogated him at the station and obtained two statements from him, even though they recognized that he was disheveled, dirty, soaking wet, upset, bruised, limping, smelling of alcohol, and complaining of lots of pain at the time. TR III 333-34, 350-52, 358. The police insisted, however, that Mr. Linde was coherent and cooperative, and was able to miraculously read his second statement without his missing eyeglasses -- even though he had been unable to read the first statement only a short time before. TR III 333-34, 364, 414. Mr. Linde testified that he was still "pretty drunk" at the time; though he frequently asked to see a doctor, he was told he would have to wait until after his statement was given. TR IV 57, 59, 87. He also stated that he was signing things he could not read without his glasses. TR IV 61.

Despite Danny Mosley's tears on the stand for his dead friend, TR II 181, he remained on the job and in the same motel room at the time, with Randy Silas' personal possessions still in the corner of the motel room. When Mosley drove back to Florida at Thanksgiving-time, he left without taking Randy's belongings with him to return to his family. TR II 205.

# I. THE TRIAL JUSTICE COMMITTED REVERSIBLE ERROR IN REFUSING TO SUPPRESS EVIDENCE SEIZED FROM UNDERNEATH EDDIE LINDE'S MATTRESS PURSUANT TO A WARRANTLESS SEARCH OF A MOTEL ROOM THAT MR. LINDE SHARED WITH A CO-WORKER, SINCE ONLY THE CO-WORKER CONSENTED TO THE SEARCH.

## The Facts

For about two to three weeks before the date of the incident, Randy Silas's group of ironworkers from Florida -- with the exception of the late-arrival, Daniel Lee Mosley – had been living at the Susse Chalet in Smithfield in rooms paid for by the company. TR I 138. The company had rented three rooms for the workers as their "home away from home" while building a new Baptist church in that town. TR IV 35. Each room was "a typical motel room," *i.e.*, "one square room" with two twin beds, a nightstand and television, and a shared bathroom and closet. TR I 3-4, 12-13. The nightstand was situated between the twin beds. TR I 12.

Mr. Linde's roommate was one of his co-workers, Shane Roberts, a friend of Mr. Linde's son, Michael, from the Marine Corps. TR IV 2, 5. Michael testified that Shane carried a gun, sometimes displayed it, and kept it, first, under his mattress and, later, in the nightstand in his room. TR IV 4, 18. This was the gun used to shoot Randy Silas.

Prior to trial, the defense moved to suppress a holster that the police seized – not from Shane Roberts's bed or from the shared nightstand – but from *underneath Eddie Linde's mattress*. The evidence established that, in searching the room, the detective lifted the mattress of Mr. Linde's bed to "about head level," and the holster, in turn, fell to the floor. TR I 13-14.

At the hearing on the motion to suppress, Mr. Linde's attorney stipulated that Shane Roberts had, in fact, given the Smithfield Police a valid oral and written consent to search Room 215 at the Susse Chalet. TR I 3, 8, 9. *See also* TR I 7, 10-11. The only issue requiring resolution was whether the roommate/cohabitant had authority to authorize a full search of Mr. Linde's private areas within the room; specifically, the mattress and box spring of his bed. TR I 9-10.

The defense argued that the search went too far, as Shane Roberts could not properly consent to the search of Eddie Linde's twin bed. TR I 10, 47. Mr. Linde had, counsel asserted, an "obvious expectation of privacy" in his unshared bed. TR I 48. The trial justice disagreed with the defendant's position, and ruled as follows:

> Well, I'm satisfied that this search was perfectly lawful. Consent was freely given. There is no dispute as to that. The only issue is whether or not the officer went too far by lifting the mattress and discovering what was underneath. In fact, by lifting the mattress, the very act of lifting it dislodged the holster, it just fell to the ground. So, apparently it wasn't very well secreted in the first place. In any event, I think that cases such as *[State v.] Payano* [, 528 A.2d 721 (R.I. 1987)] and *[State v.] Hightower* [, 661 A.2d 948 (R.I. 1995)] and some other cases that the State has provided to me, the Alabama case in 1992 *Quinn v. The State*, [611 So.2d 483 (Ala.1992)], and I think there are ample other cases as well if one were to look through the annotations that what the officer did here was perfectly legal, and the motion to suppress the holster is denied.

TR I 53-54.

Both the holster and testimony about its discovery came into evidence. State Ex. 13; TR II 329, 331. The trial prosecutor argued that by secreting the holster under his bed, Eddie Linde demonstrated both intent and premeditation. TR IV 169 (summation). *See also* TR II 121 (opening statement – facts, not argument).

**The Constitutional Argument**

The warrantless search of Eddie Linde's bed in his shared motel room was unconstitutional since his co-tenant did not have the authority to consent to a search of the bed used exclusively by Mr. Linde. Unreasonable, warrantless searches are generally prohibited by both the United States Constitution and the Rhode Island Constitution. U.S. Const. Amend. IV; R.I. Const. Art. I § 6. The United States Supreme Court has held that protection from unreasonable searches extends to the privacy of a hotel/motel room. *Stoner v. California*, 376 U.S. 483 (1964). However, there are exceptions to the warrant requirement, one of which is a search pursuant to proper, voluntary consent. *United States v. Matlock*, 415 U.S. 164 (1974); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *State v. Farrell*, 443 A.2d 438 (R.I. 1982). Consent to search may be given by one "who possesses common authority over premises or other sufficient relationship to the premises or effects sought to be inspected." *Matlock*, 415 U.S. at 171; *State v. Hightower*, 661 A.2d 948 (R.I. 1995); *State v. Farrell*, 443 A.2d 438 (R.I. 1982); *State v. Cairo*, 60 A.2d 841 (R.I. 1948).

In *Matlock, supra*, a woman who had held herself out as the wife of the defendant, consented to a search of a bedroom which she shared with him. As a result of searching the single closet in the bedroom the couple shared, the police discovered a diaper bag that contained cash from a robbery which was admitted into evidence at trial. *Id.* at 166. Holding that a person who possesses common authority over premises or effects may consent to a search of the shared area, the High Court further explained what constitutes common authority:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the *common area* to be searched.

*Id.* at 171 n.7 (citations omitted) (emphasis added). Although the Court indicated that it was likely that the woman had the requisite common authority to give valid consent as against the absent, non-consenting defendant, the case was remanded for further factual determinations. *Id.* at 177-78. While *Matlock* did not specifically address the effect of persons sharing a living space who nonetheless maintain separate, exclusive control over certain premises or effects, the Supreme Court's definition of common authority suggests that certain areas and effects reserved for exclusive use will not be subject to the consent of a co-occupant. In addition, common authority, as the Supreme Court noted, is not to be inferred merely from the consenting party's property interest. *Id.* As a result, the court must determine whether the third party, in fact, had mutual use and control of the area or effect to the extent necessary in order to properly consent to a search. Indeed, only then could a court reasonably conclude that the non-consenting tenant had "assumed the risk" (*id.*) that his co-tenant might permit a search.

Applying the *Matlock* test, the Rhode Island Supreme Court held in *State v. Farrell*, *supra*, that a garage worker did not possess the requisite mutual use or control which authorizes a third party to consent to a warrantless search of a vehicle. 443 A.2d at 442. The defendant had left the car at the garage for purposes of repair, requesting that the owner fix a dent in the car. *Id.* at 439. Considering whether the garage owner could

consent to a search and seizure of the vehicle, the court cautioned that, "The doctrine that recognizes the validity of third party consent to a search must be applied cautiously to prevent erosion of Fourth Amendment protections." *Id.* Although the defendant had relinquished temporary control of the vehicle, the court reasoned that the defendant had not conferred the common authority necessary to justify the garage worker consenting to a search and seizure of the vehicle. *Id.* at 441-42.

Conversely, the Rhode Island High Court in *State v. Cairo*, *supra*, upheld the admission of evidence seized from a search pursuant to third party consent. 60 A.2d 841. In *Cairo*, the defendant's wife consented to a search of their basement, which was shared by the two families who resided in the home. *Id.* at 845. Although *Matlock* post-dated *Cairo*, the court approved of the search with a prescient analysis, declaring, "In our judgment the search . . . was not . . . unreasonable, since the evidence secured thereby was taken, not in that portion of the house used and occupied *exclusively* by the defendant and his wife, but in the cellar . . . which was used in *common* by two different families." *Id.* (emphasis added). Essentially, the court determined that the defendant's wife had common authority over the basement due to the fact that she jointly owned the property and that the basement was not exclusively used by any one person or family. *Id.*

The motel room in the instant case was a single room with one nightstand separating two beds. The bathroom was the only other room within the motel room. Upon obtaining consent to search from Mr. Linde's roommate, the police proceeded to the motel room, where they discovered a holster hidden underneath the mattress of what was later identified as Mr. Linde's bed. Utilizing the *Matlock* rationale, the roommate's consent to search underneath Mr. Linde's bed cannot be upheld. *Matlock* establishes that

one assumes the risk of a potentially consenting co-tenant when making a conscious choice to share living quarters or effects with another person. However, as *Farrell* warned, the Fourth Amendment protections of the non-consenting tenant cannot be completely eroded by doctrine of third party consent. For all intents and purposes, the motel room that Mr. Linde shared was his "home" while working in Rhode Island, albeit a "home" provided by his employer. Within this home, Mr. Linde was quite limited in the amount of privacy he could reasonably enjoy. Very few areas of a motel room can be reserved for exclusive use when rooming with another person. Yet, the twin bed one sleeps in can be and was, in this instance, reserved for exclusive use. *Matlock* specifies that common authority is dependent upon mutual use of effects/areas to which both persons have joint authority and access. There was no ***mutual use*** of Mr. Linde's bed, even though both men had access to the room. In addition, the current case is easily distinguishable from *Cairo* because of the relationship between the defendant and the third party. Unlike the *Cairo* fact pattern, Mr. Linde and his roommate were not married, nor did they jointly own the property searched. They were merely roommates while working on an employment project. Moreover, the mattress where the holster was discovered was occupied **exclusively** by Mr. Linde, and was definitely <u>not</u> a common area like the shared basement in *Cairo*.

Courts in other jurisdictions have provided further insight into the particularities of common authority and exclusive control. *E.g.*, *Dotson v. Somers*, 402 A.2d 790 (Conn. 1978); *Dupont v. United States*, 259 A.2d 355 (D.C. App. 1969); *United States v. Poole*, 308 F. Supp. 1185 (E.D. La. 1969); *State v. Evans*, 372 P.2d 365 (Haw. 1962). In *Dotson*, the court held that the owner of a house, in which the defendant was staying,

could not consent to a search of the plaintiff's room because he "exercised control over 'everything' in his room, [] he could exclude anyone, including the owner, and [] he could bring into the room whatever he chose." 402 A.2d at 623. Thus, the court concluded that, although the plaintiff was a guest in the house, the owner did not exercise common authority over the bedroom and its contents. *Id.*

Similarly, where the defendant, a guest in his friend's apartment, had placed his overnight bag in the hallway closet, the court held that the host could not consent to a search of the bag. *Poole*, 307 F. Supp. at 1187-88. The court concluded that "a defendant may object to a search consented to by another where the defendant has exclusive control over a part of the premises searched or over an 'effect' on the premises which itself is capable of being 'searched'." *Id.* at 1189. The search of the defendant's bag was therefore unreasonable because the defendant "had a reasonable expectation that Dixon or anyone else would not open the suitcase without [the defendant's] permission." *Id.* at 1190.

The Hawaii Supreme Court, in a seminal case, held unlawful a search of the defendant's cuff link box conducted pursuant to his wife's consent. *Evans*, 372 P.2d 365, 373. Although decided under state constitutional grounds, *Evans* offers insight into the distinctions between exclusive and common authority. While the wife in *Evans* shared the bedroom with the defendant and had access to everything within the bedroom, the court determined that she could not consent to a search of the defendant's personal effects because the defendant exercised exclusive control over the effects. *Id.* at 372.

More analogous to the facts in this case, the court in *DuPont* upheld a warrantless search of the defendant's bed where a submachine gun was discovered hidden in the

blanket. 259 A.2d at 357. The court determined that the renter of the apartment where the defendant was staying could consent to a search of the defendant's bed because the girl had "sole dominion over the apartment" and "the consent of the host was directed to a part of the apartment not reserved for [defendant's] sole personal use." *Id.* at 387-88.

Not unlike the situation in *Poole*, Mr. Linde expected that no one else would access the gun holster, including his roommate, as indicated by the fact that the holster was found hidden underneath Mr. Linde's mattress – not back in the drawer of the shared nightstand. The holster also was not discovered in a closet, dresser, or one of the many other jointly used areas in the room. Like the cuff link box in *Evans*, the roommate, while clearly having physical access to the bed, had no authority to consent to a search of the bed because Mr. Linde maintained exclusive control and use of the bed.[3] Unlike the

---

[3] Mr. Linde recognizes that the United States Supreme Court has taken a firm stand against a strained application of the exclusive control concept. In *Frazier v. Cupp*, 394 U.S. 731 (1969), the United States Supreme Court upheld a search of the defendant's duffle bag which was conducted pursuant to the consent of defendant's cousin. 394 U.S. at 740. The High Court, finding that the cousin had the authority to consent to the search because the cousin had been given permission to use the duffle bag, rejected the defendant's argument that the cousin had permission to use only one compartment of the duffle bag:

> We will not, however, engage in such metaphysical subtleties in judging the efficacy of Rawls' consent. Petitioner, in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside.

*Id.* While this language suggests that a court will not engage in a strained analysis of exclusive control, *Frazier* is not on point with the current case. If Mr. Linde was arguing, for example, that he allowed the roommate to sleep on the bed but restricted him from lifting the mattress, then he would be engaging in the "metaphysical subtleties" that the High Court denounced. Instead, Mr. Linde's argument is very simple and eminently reasonable: There are two twin beds in the room; one grown man slept in one bed and another grown man slept in the other. Even *Frazier v. Cupp* certainly does not suggest that an individual has assumed the risk as to all portions of a premises shared with another.

situation in *DuPont*, Mr. Linde and his roommate were equal co-tenants with no greater rights to the room than the other. Mr. Linde had a greater expectation of privacy within the confines of his bed since that bed was Mr. Linde's only personal space in his "home away from home," and his stay in the room was not subject to the authorization of his roommate. Accordingly, the search of Mr. Linde's bed constituted a violation of constitutional magnitude.

**The Trial Justice's Authority In Support Of His Decision**

The trial justice relied on inapposite cases in ruling on the motion to suppress. In particular, the trial justice stated that he was resting his decision upon *State v. Payano*, 528 A.2d 721 (R.I. 1987), *State v. Hightower*, 661 A.2d 948 (R.I. 1995), and *Quinn v. State*, 611 So.2d 483 (Ala. Crim. App. 1992).

In *State v. Hightower*, the defendant had been sharing a bedroom with his wife in her parents' home. 661 A.2d 960. However, prior to the horrific crimes leading to the search of defendant's room in his in-laws' house, the defendant had threatened his wife. *Id.* As a result, the wife had attained a restraining order and effectively excluded the defendant from the premises. Subsequently, while investigating a triple homicide with Mr. Hightower as the prime suspect, the police obtained consent from the owner of the home, the wife's father, to search the bedroom he once occupied. In upholding the admission of evidence obtained in the bedroom, the Rhode Island Supreme Court reasoned that not only did the father have common authority, but he had "principal authority over all portions of the premises." *Id.* Indeed, Mr. Hightower did not even have standing to object to the search in the first place. The *Hightower* rationale is plainly applicable to the case at bar since Mr. Linde had not been previously evicted from his

motel room. Moreover, the roommate did not have "principal authority" over the motel room, nor was Mr. Linde staying in the motel room at the will of his roommate. Unlike Mr. Hightower, Mr. Linde still possessed authority over the room as well as a reasonable expectation of privacy in that room.

*Payano* involved the seizure of a weapon which was in plain view within the defendant's bedroom. 528 A.2d at 724. The police arrived at the defendant's home in the early morning to execute an arrest warrant, when they were granted access to the home by a woman dressed in a nightgown. *Id.* at 724. The police discovered the evidence at issue in plain view while following the woman to retrieve a pair of shoes for the defendant in the bedroom of the house. The court upheld the seizure of the evidence because the woman had given the police lawful consent to enter the premises. Unlike the holster in the current case, the evidence retrieved in *Payano* was in plain view. Additionally, the police were inside the house legally because they were executing an arrest warrant. Thus, *Payano* has no application whatsoever to the case at bar because the police did not effectively "search" anything.

In *Quinn v. State*, *supra*, an opinion issued by the Alabama Criminal Court of Appeals, the police searched a hotel room pursuant to the consent of a co-habitant of the room. 611 So.2d at 486. While searching the room, the police removed a ceiling tile from the bathroom and discovered narcotics. *Id.* at 484. Clearly, a joint tenant of a hotel room could not exclude the other inhabitant from the shared bathroom since it was a true common area. Because the respective twin beds of the hotel occupants in this case are not common areas that they must share, *Quinn* is, therefore, as readily distinguishable as the other cases relied upon by the trial justice in denying Mr. Linde's motion to suppress.

**Conclusion**

Eddie Linde's twin bed was really the only private area of his temporary home in Rhode Island. While Mr. Linde did not contest the items seized from the common areas of the motel room which he shared with his son's friend, Shane Roberts, he did object to the article taken from the only place in the room in which he had a reasonable expectation of privacy.

Although Shane Roberts's consent to search Room 215 was generally valid *vis-à-vis* Mr. Linde, Roberts simply had no authority to validate a search of the bed which was used exclusively by Mr. Linde. Eddie Linde only assumed the risk that Shane Roberts could permit a search of the *common areas* of the motel room. Indeed, the third party consent exception to the warrant requirement does not completely obliterate the Fourth Amendment rights of the person against whom the consent is provided. Because the prosecution specifically used this evidence to prove intent and premeditation, its improper admission cannot be held harmless beyond a reasonable doubt.

## II. THE TRIAL JUSTICE ERRED BY REFUSING TO INSTRUCT THE JURY ON SELF-DEFENSE.

### Proceedings Below

Prior to the trial justice's final charge to the jury, defense counsel asked for a self-defense instruction since "the evidence rises to that level" as there "is no question there is some evidence of self defense." TR IV 112-13. Counsel argued that such an instruction must be given under the caselaw "if we raise any evidence or some evidence of self-defense." TR IV 112. The prosecutor, in turn, "strongly object[ed]," "implor[ing]" the trial justice not to give the instruction since the evidence does not "rise to that level" and the instruction would only "confuse the jury." TR IV 113. Defense counsel further explained that the act of self-defense was not the accidental shooting of Randy Silas, but rather, "the act of pulling the gun out of the waist and cocking it." TR IV 113. Mr. Linde performed that act, counsel further explained, acting out of self-defense relative to Danny Mosley, not Randy Silas. The ultimate shooting of Randy Silas was a tragically accidental product of that defensive act.

Justice Krause refused to give the instruction, reasoning as follows:

> There is no evidence of self-defense in this case. Similarly, it is not sufficient enough to rise to a level that would invite an instruction but perhaps in some way you might, if it was a jurisdiction, find a way to persuade a trial Court to give that instruction, but really it sounds like an improper self-defense theory, which our Court on a number of occasions, certainly most recently in the *Catalano* case two years ago, prior to that being *Wright* in '99 indicated improper self-defense is not available in the State of Rhode Island, but beyond that, I just don't see any self-defense evidence in any way would be sufficient such that it would invite such an instruction. But by defendant's own testimony, he had certainly argued himself well before Silas and Mosley returned to the hotel, Mosley got out of the truck, he had no harsh, violent words with the defendant. The only thing I think the defendant related was that Mosley made some sarcastic remark, "it could have been your neck." Beyond that, there was no

> physical altercation whatsoever. There were no fighting words, so to speak, uttered by Mosley. Mosley didn't do anything. He didn't raise a weapon, didn't even raise a fist. There is no evidence of self-defense to my knowledge nor any lack of.

TR IV 114-15.

**The Law**

The seminal case of *State v. Butler*, 268 A.2d 433 (R.I. 1970), laid the groundwork for those circumstances in which a Rhode Island trial justice is obligated to instruct on self-defense. In *Butler*, the victim, Sheridan, was found unconscious in a vacant lot. He died twenty-seven hours later without having regained consciousness. The defendant, Butler, first gave a statement to the police that she had pushed Sheridan down, had hit him with a stone, and had emptied his pockets. At trial, she denied having given that statement and objected to its admission. Rather, she testified that because Sheridan, who was intoxicated, wanted to relieve himself, she accompanied him into the vacant lot to insure that he would not stumble and fall. However, Sheridan suddenly grabbed her from behind by the throat. She panicked and pushed him to the ground, where they struggled. She freed herself and ran to the car. The medical examiner's findings were less consistent with a fall than with injuries inflicted by a blow with a rock. Moreover, there was a great deal of undisputed evidence corroborating the statement the police had taken from the defendant, despite the defendant's eventual retraction of that statement. The trial justice declined to charge the jury on self-defense, as requested by the defendant.

On appeal, the Rhode Island Supreme Court disagreed and reversed Butler's conviction on account of that refusal. The court explained the trial justice's obligation in clear and expansive language:

> "The fact that a trial justice does not believe the accused's defense does not alter his obligation to submit such defense to the jury under proper instructions. * * * However slight and tenuous the evidence may be on which the self-defense hypothesis is advanced, it is nevertheless there for the jury's consideration, and the fair trial concept requires that the jury consider it under an appropriate instruction."

*Id.* at 436-37 (citations deleted). Quoting from a California case, the Court further stated that "'[h]owever incredible the testimony of a defendant may be, he is entitled to an instruction based upon the hypothesis that it is entirely true.'" *State v. Butler, supra*, at 438, *quoting, People v. Carmen*, 228 P.2d 281, 285 (Cal. 1951). In other words, even weak or doubtful evidence of self-defense renders the issue a question for resolution by the jury. *Accord State v. Gelinas*, 417 A.2d 1381, 1384 (R.I. 1980) ("the trial justice must maintain the defendant's right to request jury instructions on the law applicable to issues of fact which the evidence, however tenuous or incredible, has raised").

*Butler's* "however slight and tenuous" standard remains the controlling law in Rhode Island. For example, in *State v. Cipriano*, 430 A.2d 1258 (R.I. 1981), the court adhered to *Butler*, stating that a judge must give an affirmative instruction to the jury for any defense for which evidence has been produced. *Id.* at 1261-62. Likewise, in *State v. Malouin*, 433 A.2d 176 (R.I. 1981), the Court stated, "[t]he trial justice is required to accede to a defendant's request for a jury instruction on the applicable law if evidence has been adduced which would support the instruction sought." *Id.* at 178. The *Butler* standard has been most recently affirmed in *State v. DiChristofaro*, 848 A.2d 1127 (R.I. 2004), which reiterated the *Butler* gauge. In *DiChristofaro,* the Rhode Island Supreme

Court stated that a self-defense instruction is not warranted where there is no evidence on which a jury could find that the defendant acted in self-defense since, in that case, such an instruction would confuse or mislead the jury. Moreover, added the Court, one who is clearly the aggressor, as was Mr. DiChristofaro, is not entitled to raise the defense. *Id.* at 1131. In addition, subsequent cases have cited *Butler* for the more general proposition that refusal to give an instruction to which the defendant is entitled may constitute prejudicial error. *E.g.*, *State v. McGuy*, 841 A.2d 1109, 1112 (R.I. 2003); *State v. Fetzik*, 577 A.2d 900, 993 (R.I. 1990); *State v. Hockenhull*, 525 A.2d 926, 930 (R.I. 1987).

In a nutshell, *Butler* and its progeny suggest that an instruction may be warranted where the supporting evidence: (1) is introduced through testimony or other evidence, not merely by argument of counsel; and (2) does not negate the theory of defense for which the instruction is sought. Accordingly, instructions have been denied because of a complete lack of evidence in cases such as the following: *State v. Amaral*, 108 R.I. 755 (1971) (refusal to instruct on intoxication when only testimony was that defendant drank one-fourth of a double-scotch); *State v. D'Amario*, 568 A.2d 1383 (R.I. 1990) (refusal to instruct on self-defense when only mention was a rhetorical questions in defense counsel's closing argument); *State v. Medeiros*, 599 A.2d 723 (R.I. 1991) (refusal to instruct on accessory before the fact when no evidence was introduced); and *State v. Mastracchio*, 612 A.2d 698 (R.I. 1992) (refusal to give instruction on aiding and abetting when not supported by evidence, because it could confuse the jury). Moreover, instructions have been denied where the only evidence presented was actually inconsistent with the defense, as in *State v. Martinez*, 652 A.2d 958 (R.I. 1995) (evidence that defendant chased the assault victim and instigated the confrontation negated his

claim of self-defense), and *State v. DiChristofaro* (refusal to give instruction on self-defense when defendant pursued the victim and hit victim in the back with a broken bottle while victim was walking away).

In sum, *Butler* established that, in Rhode Island, the defendant has to cross a fairly low threshold in order to receive a self-defense instruction.

**Application Of The Law To The Facts**

In the instant case, the evidence adduced at trial was sufficient to satisfy the minimal standards this court has delineated before a self-defense instruction must be given by the trial justice. The crew of ironworkers to which Mr. Linde belonged already had been at work for two or three weeks, *without incident*, before Danny Mosley arrived. TR II 138. By Mosley's second day on the job, he had stirred-up trouble with Mr. Linde, one of the older union workers that Randy Silas brought up from Florida to build the church. TR II 164, 187. Danny Mosley himself admitted that he did not like Eddie Linde. TR II 189. Mr. Linde testified that Mosley had spent the entire day of the incident undermining his work and goading him into a fight. TR IV 38. Both Mr. Linde and his son testified that when Mosely's persistent sabotage efforts finally escalated to blows, it was Mosely who took the first aggressive action by shoving Mr. Linde in the face so hard that he fell to the iron flooring and sustained a painful knee injury. TR IV 11, 26, 40-41. So sure was Mr. Linde that a crime had been committed against him, that he summoned the police shortly after the scuffle.

After a day of "self-medication" with two bottles of vodka and a 12pk of malt liquor, Mr. Linde said he decided to go out to the parking lot to await his co-workers's return from work so that his son could take him to the hospital. TR IV 47. He decided

(improvidently, to be sure) to take his roommate's gun along with him so that Danny Mosley would not "bother" him again. TR IV 47. Mr. Linde stepped out into the parking lot just as Danny Mosley and Randy Silas were pulling up in Randy's truck. TR IV 48. After the two of them stepped out of the truck, Mr. Linde testified, Randy walked straight up to him and asked him what he was doing with the gun; he, in turn, replied that he wouldn't let Mosley "jump on" him again. TR IV 50. Mr. Linde's testimony proceeded as follows:

> Q What happened next, if anything?
>
> A Then Mosley came around the back of the truck. * * * He was on the passenger side. He came around the side of the truck, and he threw a bag up in the back of the truck or threw his stuff in the back of the truck or a bag whatever he had with him.[4]
>
> Q You saw Mr. Mosley carrying something?
>
> A Yes, sir.
>
> Q And did you see what he did with that?
>
> A He set it up in the back of the truck.
>
> Q Do you know what he was carrying; do you recall?
>
> A I was thinking it was something with a weapon in it.
>
> Q Did you see what he was carrying?
>
> A It looked like Randy's bag.
>
> * * *

---

[4] Mr. Mosley said that when shots were fired, he ran into the woods carrying a bag of chips and soda as well as a heavy black bag; when he returned to the parking lot, he brought the chips and soda back with him, but left a heavy black bag he had been carrying "in the shadows." TR II 195-98, 202. Smithfield Patrol Sergeant Kenneth A. Breen found a soda bottle and potato chip bag perched on a vehicle in the parking lot. TR III 326.

Q What happened then, if anything?

A Then when he was coming around the back of the truck he was telling me it could have been my neck.

Q Who was?

A Mosley. And then something about a gun.

Q What happened next, if anything?

A Well, I figured –

Q What did you do, if anything?

A I figured he might be going around with the gun in that bag so I pulled that gun and I cocked it and when I cocked it, I almost dropped it. When I gained control of it again, I grabbed it, and a round shot off.

Q And where was Randy compared to where you were?

A Behind me. * * * He was more or less in my blind spot.[5]

* * *

Q Was he on your left?

A Yes, sir.

Q And behind you a little bit?

A Yes, sir.

Q Who were you facing?

A I was facing Mosley.

Q What happened; you cocked your gun?

---

[5] Interestingly, Danny Mosley also testified that Mr. Linde's back was to Randy Silas, and Randy was a few feet behind Linde .TR II 202. Mr. Mosley further stated that the gun was being pointed directly at him and that Mr. Linde's eyes were on him the whole time. *Id.*; TR II 175, 200.

A I cocked the – I had – whenever I slid the top of the gun and let it go, it about jumped out of my hand and when I grabbed it, a round shot off.

Q Then what happened?

A Then while I was looking at the gun when that happened and I looked at Mosley and he turned and went around the truck. * * * I walked over to the edge of the truck to see where he had went and he had went around front and he came back around and looked straight at me and ran across the parking lot.

Q Then what happened?

A Then I turned around and saw Randy lying on the ground. I went over to him.

TR II 50-52. Mr. Linde swore that he did not intend to kill anybody. TR II 56.

Although the police never recovered Danny Mosley's black bag "from the shadows" (Mosley testified that he retrieved it himself the next day, TR II 196), the police found a dark green, unzipped bag right next to Randy Silas's body, with the butt end of a fully loaded .357 sticking out of the bag in plain view. TR II 268-69, 272, 274-75. As for Randy Silas's firearms, the testimony established everyone's common knowledge that Randy Silas liked guns, owned guns, brought a .357 as well as a mini-revolver with him to Smithfield, and always carried a gun in his green and/or black bag or on his person. TR II 150, 210; TR IV 9, 10, 25, 36-37, 51.)[6]

In the immediate aftermath of the shooting, the civilian bystander to whom Mr. Linde apologetically handed the gun, testified that Mr. Linde was ranting about a "hit man" being after him. TR II 125-26, 128.

---

[6] The evidence also established that the green bag found near the body contained a number of prescription bottles, a crack pipe, tools, and .380 live cartridges.

A fair reading of the record compels the conclusion that the trial justice should have given this instruction, as prayed. Both Mr. Linde and other witnesses testified as to his self-defensive actions against Danny Mosley that night:

- The fact that there was bad blood between the two and a physical confrontation earlier that day;
- The fact that Mosley was carrying what appeared to be Randy Silas's gun case, which possession was coupled with Mosley's threatening words to Mr. Linde that "it could have been [your] neck" and "something about a gun";
- The fact that Danny Mosley testified that Mr. Linde was focusing on, and pointing the gun at, him;
- The fact that Mr. Linde's back was to Randy Silas; and
- The fact that an objective observer heard Mr. Linde ranting, in part, about a "hit man" being after him.

Because this evidence (1) was given *via* trial testimony and not in argument alone, and (2) does not negate Eddie Linde's theory of self-defense, the *Butler* standard was definitely met herein.

The trial justice's reliance on *State v. Catalano*, 750 A.2d 426 (R.I. 2000), and *State v. Wright*, 558 A.2d 946 (R.I. 1989), both imperfect self-defense cases,[7] was misplaced. Though the trial justice was correct in saying that the theory of imperfect self-defense has been rejected in Rhode Island, Mr. Linde did not invoke it here. Rather,

[7] In the defense of "imperfect self-defense," which reduces the crime of murder to voluntary manslaughter, the theory underlying the doctrine is that when a defendant uses deadly force with an honest but unreasonable belief that it is necessary to defend himself, the element of malice, necessary for a murder conviction, is lacking.

Mr. Linde's defense was that though he took intentionally self-defensive actions against the threatening Danny Mosley immediately preceding the shooting, the shooting itself and the resulting death of Randy Silas were the products of accident. Though the accident instruction was properly given, the self-defense instruction was refused. Yet, the self-defense instruction was necessary to support the ***ultimate*** defense theory of accident as to the murder charge itself. In other words, what started as an act of self-defense against the provoking party swiftly and tragically became an accidental killing of an innocent party. Not only were these two theories not mutually exclusive (*See, e.g.*, defenses of accident and self-defense not invariably inconsistent and mutually exclusive), but they were also critical to deciding Mr. Linde's guilt or innocence in a way that made sense on these facts.

As Mr. Linde's conviction demonstrates, it is hard to invoke the solo defense of accident when the accused appears at the scene and intentionally brandishes a loaded gun. The jury did not have sufficient direction in which to assess this case for what it truly was: A case of self-defense gone bad. The failure to give this instruction, as requested, constituted reversible error.

## CONCLUSION

For all of the foregoing reasons, as well as for those reasons stated in the other grounds raised herein as well as those that may later arise, the Petitioner, Eddie M. Linde, very respectfully prays that his petition be granted forthwith.

Respectfully submitted,

EDDIE LINDE

Eddie M Linde

*Pro se*

A I cocked the – I had – whenever I slid the top of the gun and let it go, it about jumped out of my hand and when I grabbed it, a round shot off.

Q Then what happened?

A Then while I was looking at the gun when that happened and I looked at Mosley and he turned and went around the truck. * * * I walked over to the edge of the truck to see where he had went and he had went around front and he came back around and looked straight at me and ran across the parking lot.

Q Then what happened?

A Then I turned around and saw Randy lying on the ground. I went over to him.

TR II 50-52. Mr. Linde swore that he did not intend to kill anybody. TR II 56.

Although the police never recovered Danny Mosley's black bag "from the shadows" (Mosley testified that he retrieved it himself the next day, TR II 196), the police found a dark green, unzipped bag right next to Randy Silas's body, with the butt end of a fully loaded .357 sticking out of the bag in plain view. TR II 268-69, 272, 274-75. As for Randy Silas's firearms, the testimony established everyone's common knowledge that Randy Silas liked guns, owned guns, brought a .357 as well as a mini-revolver with him to Smithfield, and always carried a gun in his green and/or black bag or on his person. TR II 150, 210; TR IV 9, 10, 25, 36-37, 51.)[6]

In the immediate aftermath of the shooting, the civilian bystander to whom Mr. Linde apologetically handed the gun, testified that Mr. Linde was ranting about a "hit man" being after him. TR II 125-26, 128.

---

[6] The evidence also established that the green bag found near the body contained a number of prescription bottles, a crack pipe, tools, and .380 live cartridges.

A fair reading of the record compels the conclusion that the trial justice should have given this instruction, as prayed. Both Mr. Linde and other witnesses testified as to his self-defensive actions against Danny Mosley that night:

- The fact that there was bad blood between the two and a physical confrontation earlier that day;
- The fact that Mosley was carrying what appeared to be Randy Silas's gun case, which possession was coupled with Mosley's threatening words to Mr. Linde that "it could have been [your] neck" and "something about a gun";
- The fact that Danny Mosley testified that Mr. Linde was focusing on, and pointing the gun at, him;
- The fact that Mr. Linde's back was to Randy Silas; and
- The fact that an objective observer heard Mr. Linde ranting, in part, about a "hit man" being after him.

Because this evidence (1) was given *via* trial testimony and not in argument alone, and (2) does not negate Eddie Linde's theory of self-defense, the *Butler* standard was definitely met herein.

The trial justice's reliance on *State v. Catalano*, 750 A.2d 426 (R.I. 2000), and *State v. Wright*, 558 A.2d 946 (R.I. 1989), both imperfect self-defense cases,[7] was misplaced. Though the trial justice was correct in saying that the theory of imperfect self-defense has been rejected in Rhode Island, Mr. Linde did not invoke it here. Rather,

---

[7] In the defense of "imperfect self-defense," which reduces the crime of murder to voluntary manslaughter, the theory underlying the doctrine is that when a defendant uses deadly force with an honest but unreasonable belief that it is necessary to defend himself, the element of malice, necessary for a murder conviction, is lacking.

Mr. Linde's defense was that though he took intentionally self-defensive actions against the threatening Danny Mosley immediately preceding the shooting, the shooting itself and the resulting death of Randy Silas were the products of accident. Though the accident instruction was properly given, the self-defense instruction was refused. Yet, the self-defense instruction was necessary to support the ***ultimate*** defense theory of accident as to the murder charge itself. In other words, what started as an act of self-defense against the provoking party swiftly and tragically became an accidental killing of an innocent party. Not only were these two theories not mutually exclusive (*See, e.g.,* defenses of accident and self-defense not invariably inconsistent and mutually exclusive), but they were also critical to deciding Mr. Linde's guilt or innocence in a way that made sense on these facts.

As Mr. Linde's conviction demonstrates, it is hard to invoke the solo defense of accident when the accused appears at the scene and intentionally brandishes a loaded gun. The jury did not have sufficient direction in which to assess this case for what it truly was: A case of self-defense gone bad. The failure to give this instruction, as requested, constituted reversible error.

## CONCLUSION

For all of the foregoing reasons, as well as for those reasons stated in the other grounds raised herein as well as those that may later arise, the Petitioner, Eddie M. Linde, very respectfully prays that his petition be granted forthwith.

Respectfully submitted,

EDDIE LINDE

Eddie M Linde

*Pro se*