State v. LindeR.I.,2005.
Supreme Court of Rhode Island.
STATE
v.
Eddie M. **LINDE**.
**No. 2003-336-C.A.**

July 7, 2005.

**Background:** Defendant was convicted in the Superior Court, Providence County, Robert D. Krause, J., of various offense, including second-degree murder and assault with intent to murder. Defendant appealed.

**Holdings:** The Supreme Court, Suttell, J., held that:

(1) defendant's roommate had sufficient authority to consent to warrantless search of all areas of motel room he shared with defendant, including defendant's bed;

(2) trial court's failure to give instruction on self-defense in regard to charge of assault with intent to murder did not prevent defendant from taking full advantage of his defense of accident to murder charge; and

(3) defendant was not entitled to self-defense instruction as to charge of assault with intent to murder.

Affirmed.

West Headnotes

**[1] Searches and Seizures 349 176**

349 Searches and Seizures
349V Waiver and Consent
349k173 Persons Giving Consent
349k176 k. Hotels and Motels. Most Cited Cases

Defendant's roommate had sufficient authority to consent to warrantless search of all areas of motel room he shared with defendant, including defendant's bed; no evidence existed that any part of the room was reserved for defendant's sole personal use, as roommate had the authority, at least when defendant was not in the room, to place items, to sit, or allow others to sit, on the bed in which defendant slept. U.S.C.A. Const.Amend. 4..

**[2] Criminal Law 110 1139**

110 Criminal Law
110XXIV Review
110XXIV(L) Scope of Review in General
110k1139 k. Additional Proofs and Trial De Novo. Most Cited Cases

**Criminal Law 110 1158(4)**

110 Criminal Law
110XXIV Review
110XXIV(O) Questions of Fact and Findings

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

110k1158 In General
110k1158(4) k. Reception of Evidence. Most Cited Cases
In reviewing the trial justice's denial of defendant's motion to suppress the incriminating evidence, Supreme Court defers to the factual findings of the trial justice, applying a clearly erroneous standard; however, with respect to questions of law and mixed questions of law and fact involving constitutional issues, Supreme Court engages in a de novo review.

**[3] Arrest 35 68(10)**

35 Arrest
35II On Criminal Charges
35k68 Mode of Making Arrest
35k68(6) Intrusion or Entry
35k68(10) k. Entry Without Warrant Impermissible. Most Cited Cases

**Searches and Seizures 349 25.1**

349 Searches and Seizures
349I In General
349k25 Persons, Places and Things Protected
349k25.1 k. In General. Most Cited Cases
Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. U.S.C.A. Const.Amend. 4.

**[4] Searches and Seizures 349 26**

349 Searches and Seizures
349I In General
349k25 Persons, Places and Things Protected
349k26 k. Expectation of Privacy. Most Cited Cases
Overnight guests and joint occupants of motel rooms possess reasonable expectations of privacy in the property on which they are staying, of kind protected by Fourth Amendment. U.S.C.A. Const.Amend. 4.

**[5] Searches and Seizures 349 171**

349 Searches and Seizures
349V Waiver and Consent
349k171 k. In General. Most Cited Cases
One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. U.S.C.A. Const.Amend. 4.

**[6] Searches and Seizures 349 171**

349 Searches and Seizures
349V Waiver and Consent
349k171 k. In General. Most Cited Cases

**Searches and Seizures 349 173.1**

349 Searches and Seizures
349V Waiver and Consent
349k173 Persons Giving Consent
349k173.1 k. In General. Most Cited Cases
Fourth Amendment prohibition against unreasonable searches and seizures does not apply to situations in which voluntary consent to search has been obtained, either

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from the individual whose property is searched or from a third party who possesses common authority over the premises. U.S.C.A. Const.Amend. 4.

**[7] Searches and Seizures 349 173.1**

349 Searches and Seizures
349V Waiver and Consent
349k173 Persons Giving Consent
349k173.1 k. In General. Most Cited Cases

A third party's consent to search is valid if that person has either the actual authority or the apparent authority to consent to a search of that property. U.S.C.A. Const.Amend. 4.

**[8] Searches and Seizures 349 194**

349 Searches and Seizures
349VI Judicial Review or Determination
349k192 Presumptions and Burden of Proof
349k194 k. Consent, and Validity Thereof. Most Cited Cases

State has burden of establishing that person who gave authority to conduct warrantless search of premises had common authority over premises. U.S.C.A. Const.Amend. 4.

**[9] Searches and Seizures 349 173.1**

349 Searches and Seizures
349V Waiver and Consent
349k173 Persons Giving Consent
349k173.1 k. In General. Most Cited Cases

For purposes of validity of consent to search by one who possesses common authority over premises or effects with one or more persons, common authority rests on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched. U.S.C.A. Const.Amend. 4.

**[10] Searches and Seizures 349 173.1**

349 Searches and Seizures
349V Waiver and Consent
349k173 Persons Giving Consent
349k173.1 k. In General. Most Cited Cases

Under the "apparent authority" exception, Fourth Amendment is not violated when officers enter without a warrant when they reasonably, although erroneously, believe that the person who consents to their entry has the authority to consent to this entry, and determination of reasonableness of the officer's belief is an objective one, asking whether the facts available to officer at that moment would warrant a person of reasonable caution in the belief that the consenting party had authority over the premises. U.S.C.A. Const.Amend. 4.

**[11] Searches and Seizures 349 192.1**

349 Searches and Seizures
349VI Judicial Review or Determination
349k192 Presumptions and Burden of Proof
349k192.1 k. In General. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The burden of demonstrating an independent expectation of privacy for purposes of Fourth Amendment protection is on defendant. U.S.C.A. Const.Amend. 4.

**[12] Criminal Law 110 769**

110 Criminal Law
110XX Trial
110XX(G) Instructions: Necessity, Requisites, and Sufficiency
110k769 k. Duty of Judge in General. Most Cited Cases
The charge given by a trial justice need only adequately cover the law.

**[13] Criminal Law 110 822(1)**

110 Criminal Law
110XX Trial
110XX(G) Instructions: Necessity, Requisites, and Sufficiency
110k822 Construction and Effect of Charge as a Whole
110k822(1) k. In General. Most Cited Cases
On review, Supreme Court examines the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them.

**[14] Criminal Law 110 769**

110 Criminal Law
110XX Trial
110XX(G) Instructions: Necessity, Requisites, and Sufficiency
110k769 k. Duty of Judge in General. Most Cited Cases

**Criminal Law 110 778(5)**

110 Criminal Law
110XX Trial
110XX(G) Instructions: Necessity, Requisites, and Sufficiency
110k778 Presumptions and Burden of Proof
110k778(5) k. Shifting Burden of Proof. Most Cited Cases
Supreme Court shall affirm a trial justice's jury instructions when the instructions adequately cover the law and neither reduce nor shift the State's burden of proof.

**[15] Criminal Law 110 829(1)**

110 Criminal Law
110XX Trial
110XX(H) Instructions: Requests
110k829 Instructions Already Given
110k829(1) k. In General. Most Cited Cases
As long as the trial justice's general charge has fairly covered a requested charge for jury instructions, his refusal to grant the requested charge is not reversible error.

**[16] Homicide 203 1473**

203 Homicide
203XII Instructions
203XII(E) Excuses and Justifications
203k1471 Self-Defense
203k1473 k. Necessity of Instruction in General. Most Cited Cases
Trial court's failure to give instruction on self-defense in regard to charge of assault with intent to murder did not prevent defendant from taking full advantage of his defense of accident to murder charge;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nothing indicated that jury did not give full consideration to the trial justice's instruction concerning the defense of accident when it found defendant guilty of murder, and defendant did not challenge the adequacy of the trial justice's accident instruction.

**[17] Homicide 203 795**

203 Homicide
203VI Excusable or Justifiable Homicide
203VI(B) Self-Defense
203k792 Apprehension of Danger
203k795 k. Reasonableness of Belief or Apprehension. Most Cited Cases

Under the law relating to self-defense, one may defend oneself whenever one reasonably believes that he or she is in imminent danger of bodily harm at the hands of another.

**[18] Homicide 203 807**

203 Homicide
203VI Excusable or Justifiable Homicide
203VI(B) Self-Defense
203k806 Manner or Means of Self-Defense
203k807 k. In General. Most Cited Cases

Although a person may defend himself or herself without the necessity of waiting for the other to strike the first blow, the individual must use only such force as is reasonably necessary for his own protection.

**[19] Homicide 203 799**

203 Homicide
203VI Excusable or Justifiable Homicide
203VI(B) Self-Defense
203k798 Duty to Retreat or Avoid Danger
203k799 k. In General. Most Cited Cases

**Homicide 203 807**

203 Homicide
203VI Excusable or Justifiable Homicide
203VI(B) Self-Defense
203k806 Manner or Means of Self-Defense
203k807 k. In General. Most Cited Cases

The permissible degree of force used in defense of oneself varies with the particular set of circumstances in which he or she acts, but in no set of circumstances may one apply more than that degree of force necessary to prevent bodily injury; however, when deadly force is involved, individuals who are attacked must attempt to retreat if they are consciously aware of an open, safe and available avenue of escape.

**[20] Homicide 203 687**

203 Homicide
203IV Manslaughter
203k686 Imperfect Self-Defense
203k687 k. In General. Most Cited Cases

Doctrine of imperfect self-defense, when recognized, purports to reduce the crime of murder to voluntary manslaughter.

**[21] Homicide 203 1484**

203 Homicide
203XII Instructions
203XII(E) Excuses and Justifications
203k1471 Self-Defense
203k1484 k. Apprehension of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Danger. Most Cited Cases
Defendant was not entitled to self-defense instruction as to charge of assault with intent to murder; evidence did not indicate that defendant had reason to believe that he was in imminent peril of bodily harm when he pulled out gun and cocked it, as there was no suggestion that victim had any weapon in his hand, nor that he was in any way acting aggressively toward defendant, and evidence confirmed that defendant instigated the confrontation with victim by stepping into the parking lot carrying a loaded weapon and by approaching victim with it to prevent him from "jumping on him again."

**[22] Homicide 203 1476**

203 Homicide
203XII Instructions
203XII(E) Excuses and Justifications
203k1471 Self-Defense
203k1476 k. Necessity When There Is Some, Any, Slight, or Weak Evidence of Self-Defense in General. Most Cited Cases
A trial justice must instruct the jury on self-defense regardless of how slight and tenuous the evidence may be on which the self-defense hypothesis is advanced.

**[23] Homicide 203 774**

203 Homicide
203VI Excusable or Justifiable Homicide
203VI(B) Self-Defense
203k773 Aggression or Provocation by Accused
203k774 k. In General. Most Cited Cases
One may not invoke the doctrine of self-defense if he or she has instigated the combative confrontation, as self-defense is grounded on necessity, and one cannot provoke a difficulty, thus creating the necessity, and then justify the resulting homicide or injury as an act of necessity and self-defense.

***1118** Christopher R. Bush, Esq., for Plaintiff.
Catherine A. Gibran, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**OPINION**

SUTTELL, Justice.
Tragic events involving an ironworking crew from Florida constructing the iron substructure of a church in Smithfield, Rhode Island, culminated in the shooting death of one of the workers in the parking lot of the Susse Chalet motel on October 23, 2001. As a result the defendant, Eddie M. Linde, was charged by indictment with first-degree murder and sixteen additional felony offenses. Six counts were dismissed before trial pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure and the remaining eleven counts were tried before a jury. On May 29, 2002, the jury returned not-guilty verdicts on two counts, and guilty verdicts on nine counts, including murder in the second degree. After denying the defendant's motion for a new trial, the trial justice sentenced him on the various felonies, most significantly to life imprisonment, consecutive to a forty-year sentence with twenty years to serve. FN1

FN1. The defendant was convicted and sentenced as follows:
Count 1-second-degree murder of Randy Silas, forty years (twenty

years to serve);

Count 3-discharging a firearm while committing a crime of violence against Randy Silas, mandatory life imprisonment, consecutive to count 1;

Count 4-assault with intent to murder Daniel Mosley, fifteen years (ten years to serve) (The judgment of conviction and commitment erroneously recorded the sentence on count 4 as five years instead of the fifteen years imposed by the trial justice.);

Count 7-discharging a firearm while committing a crime of violence against Daniel Mosley, ten years suspended, with probation, consecutive to count 4;

Count 8-felony assault against Richard Amon, ten years (one year to serve);

Count 9-using a firearm while committing a crime of violence against Richard Amon, ten years suspended, with probation, consecutive to count 8;

Count 10-felony assault against Frank Parrillo, ten years (one year to serve);

Count 11-using a firearm while committing a crime of violence against Frank Parrillo, ten years suspended, with probation, consecutive to count 10;

Count 16-carrying a pistol without a license, ten years (one year to serve).

Linde contends on appeal that the Superior Court committed two errors that warrant setting aside the judgment of conviction and granting him a new trial. He asserts that the trial justice erred in refusing to suppress evidence seized from under his motel room mattress, pursuant to a warrantless search that his roommate consented to. Secondly, defendant asserts that the trial justice erred by refusing to instruct the jury on self-defense. For the reasons stated below, we affirm the judgment of conviction.

## I

## Statement of Facts

The events preceding the fateful and fatal shooting that evening are largely undisputed. The defendant came to Rhode Island in early October 2001 as a member of a crew of ironworkers from Florida to ***1119** work on the Ocean State Baptist Church in Smithfield. The group initially consisted of the foreman, Randy Silas, Eddie M. Linde (defendant), Michael Linde (defendant's son), Shane Roberts, and Kent Holton. The defendant, a twenty-six-year veteran ironworker from Florida, had met Silas only several weeks earlier through a mutual acquaintance. At the time, Silas was hiring a crew to do the subcontracting work on the church in Smithfield. Linde, a certified welder and union ironworker, accepted this nonunion position because Silas agreed to train his son Michael and his son's friend Shane Roberts in the ironwork trade. Michael Linde and Roberts recently had been discharged from the Marine Corps and had experienced difficulties finding decent jobs. The crew stayed at the Susse Chalet in Smithfield, where Silas had rented three rooms. The defendant shared a room with Roberts, Michael Linde roomed with Kent Holton, and Silas initially stayed in a room by himself.

Several weeks later, around October 20, 2001, a sixth worker, Daniel Mosley, joined the crew. He testified that he came to Rhode Island from Florida at the request of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Silas, with whom he had worked on numerous occasions over the previous two years. Mosley described his responsibilities at the job site as those of a foreman, working under the direction of Silas and supervising the other four workers. Mosley roomed with Silas at the motel and drove to and from work with Silas in the latter's truck.

Mosley testified that he quickly developed a dislike of Linde, whom he described as a belligerent fellow, "disruptive towards everyone" at the job site and not a good welder.

Their respective responsibilities soon brought them into conflict. Mosley's duties included "hanging iron." He would raise and place three-by-twenty-foot sheets of corrugated steel on girders and mark them where they were to be welded to the bar joists below. It was then Linde's job to weld the sheets to the joists. Mosley testified that Linde would burn completely through the joists. Linde testified that he burned unnecessary holes because the decking was marked incorrectly.

Whatever the cause, the disagreements between the two men reached a boiling point on October 23, 2001, only Mosley's second or third day on the job. Linde testified that he had had to re-mark a lot of decking that had been wrongly marked. He said that after five hours of picking up the sheets to determine the position of the joists underneath, he became annoyed and started cussing and complaining. The tension between the two ironworkers escalated when Mosley removed a work-welding shirt that Linde had placed on a piece of iron. According to Mosley, he removed the shirt and "laid it on the deck." Linde testified that he noticed the shirt "laying in a puddle of water" and asked who had put it there, at which point Mosley came up swearing and screaming that he had put it there. Mosley's version of the incident was that Linde approached him from behind, cussing and wanting to know who the "jackass" was who had thrown his shirt down.

In any event, words were exchanged, and then the two began to scuffle. Silas jumped between them, attempting to break it up, but Mosley shoved him out of the way and threw Linde to the ground. Mosley testified that he was "pretty much going to beat the heck out of him" until Silas and another man grabbed and restrained him. The dispute ended, and the two men shook hands, acknowledging that they can "fight one minute and everything is okay the next."

***1120** Mosley went right back to work, but Linde was in a great deal of pain and concerned about his knee. He said that he had undergone five previous surgeries on his right leg, and felt certain that his knee was "torn out." Linde, wanting medical attention, borrowed a car and drove to the motel to retrieve his ironworker's insurance card. Unable to find it, he returned to the job site, where Silas advised him to call his wife in Florida for the insurance information and go to a clinic. He then did go to the clinic, but testified that the clinic would not accept him for treatment. Linde drove back to the work site. Silas told him to go back to the motel to see whether the swelling in his knee would subside, and to return to work the next day.

At the Susse Chalet, the desk clerk asked Linde what had happened and suggested that he call the police. Detective Lisa St. Angelo of the Smithfield Police Department FN2 testified that she went to the Susse Chalet in Smithfield at about 5:20 p.m. on October 23, 2001, for a possible assault

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complaint. She said that Linde initially was very upset, but calmed down when she spoke with him. Detective St. Angelo further testified that Linde told her that he had injured his knee during an altercation on the job earlier in the day and that he had wrapped it up because it was gushing with blood. When she asked to see the knee, she did not observe any injury or swelling. The defendant later denied telling the police officer that his knee was gushing with blood. To investigate the complaint fully, Det. St. Angelo then went to the work site to talk to witnesses. There, she spoke with Silas and Mosley; Mosley confirmed that he and Linde had been involved in an altercation. She then returned to the Susse Chalet and spoke again with Linde. She informed him that if he wanted to continue to press charges she would have to arrest both him and Mosley because both appeared to be mutually responsible for the fracas. At that point, Linde informed her that he did not wish to pursue the criminal complaint. Linde also told her that he would not cause any problems when the other workers returned to the motel that night and that he planned to return to Florida at the end of the week.

FN2. Detective St. Angelo was a patrol officer with the Smithfield Police Department at the time of the incident.

Frank Parrillo, the motel clerk, testified that at some point after the police officer left, he contacted Linde in his room because he saw that Linde was incurring long-distance telephone charges and wanted to inform him that he probably would be responsible for these charges. Linde told him that he was just calling his wife to tell her that he would be coming home as soon as he had the money to travel to Florida. Parrillo further noted that when he initially spoke with him, Linde appeared "very soft-spoken, gentlemanly." He seemed "resigned to the fact that he got hurt," and was not resentful. When Parrillo spoke again with defendant about the phone charges, Linde told him that he would seek medical attention for his knee when he returned to Florida. Detective St. Angelo, however, had observed that Linde had enlarged pupils and seemed dazed, prompting her to ask whether he was on drugs or medication. The defendant denied that, and the police officer said she did not detect any smell of alcohol.

The defendant did, however, resort to self-medication for the pain in his knee. He testified that he drank two bottles of vodka and a bottle of Smirnoff malt liquor ***1121** and became intoxicated.[FN3] After finishing those, he drank some coolers and looked for more alcohol because he "was still pretty much in pain." He searched in the nightstand in his motel room, which he had not opened before, and came across his roommate's 9 mm handgun.[FN4] Michael Linde testified that Shane Roberts had found this gun while moving from California to Florida, and that he kept it in his motel room at the Susse Chalet.

FN3. There was testimony that the alcohol had been purchased the night before and was stored in the room that Shane Roberts and defendant shared.

FN4. In his second statement to the police after his arrest, Linde said that he had taken the gun from Silas's truck earlier during the day, before his attempt to seek medical attention for his knee.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Shortly after 10 p.m., the truck with Silas and Daniel Mosley pulled into the parking lot of the Susse Chalet in Smithfield and parked under a streetlight. From this point on the account of events given by Linde differs significantly from those given by other witnesses.

In his initial statement to the police at 3:06 a.m. on October 24, 2001, Linde said that he was in a grassy area adjacent to the parking lot, playing with a dog, when Silas and Mosley returned. He said he approached the truck and informed Silas that he needed to go to the hospital. He also said that, at that point, Mosley came around the side of the truck, told him "it could have been your neck," and pulled out a gun. Linde told the police that he grabbed the gun with both hands, and that it discharged and Silas fell to the ground. According to Linde's initial statement, Mosley immediately ran off into the woods, leaving him standing there holding the gun.

In his second statement to the police, given several hours later, Linde said that he had taken the gun from Silas's truck earlier in the day so he could shoot Mosley in the knee in retribution for what Mosley had done to his knee. Sitting in his room drinking, he remembered about the gun, took it out of its holster, hid the holster under the mattress, put the gun in his pants, and pulled his shirt over it. He said that he then went outside and waited for Silas and Mosley in the parking lot. When the two returned and climbed out of Silas's truck, he told Silas to take him to the emergency room. Then he took out the gun and pointed it at Mosley to shoot him in the knee. When it did not go off, he said, Silas told him "give me that, you don't even know how to cock it." Linde said that he then pulled back on the gun and that it went off. Seeing Mosley run off, he fired a shot beside him. Then he looked to where Silas was standing and saw that he had been shot and had fallen to the ground.

At trial, Linde offered a third version. He testified that he found the gun in the nightstand and carried it with him when he stepped outside into the motel parking lot at the same time the truck with Silas and Mosley arrived. He said he brought the gun to prevent Mosley from assaulting him again because he felt that if he "tears my other knee out, I would be in bad shape." He also said that when the truck had parked, Silas stepped out and approached him. Linde told him that he needed someone to take him to the hospital. When Silas inquired what defendant was doing with the gun, Linde told him that he wanted to prevent Mosley from "jump[ing] on [him] again." To this, defendant testified, Silas responded by telling him that he did not need that and that he would take him to the emergency room. At that point, Mosley came around the truck on the passenger side and threw a bag in the back of ***1122** the truck. The defendant testified that he thought the bag looked like one belonging to Silas, which he knew to contain Silas's weapons. He was aware that Silas possessed a black bag in which he stored his guns. After coming around the back of the truck, defendant said, Mosley told him that it could have been his neck, followed by a statement about a gun. Thinking that Mosley might be approaching him with a gun, defendant said that he pulled out the gun he was carrying and cocked it. When he did so, he fumbled the gun, and as he attempted to regain control of it, a round discharged. He also testified that he then observed Mosley go around the truck and run across the parking lot before he saw Silas lying on the ground and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

realized that he had shot him.

The defendant also testified that he then went to the front of the motel, where he saw a man and a woman. He tried to hand the gun to the woman, but she did not believe that it was real. Linde, therefore, fired a shot into the ground to prove that it was a real gun, and then handed it to the man. He said that he then left the motel on foot, and later was apprehended by a police officer. He denied that he ever entered the lobby of the motel with the gun.

The defendant's statements about the events differ significantly from those other witnesses gave. Daniel Mosley, the only eyewitness to the shooting of Silas, testified that he and Silas worked at the church until about 10 p.m. on October 23, 2001. He and Silas then returned to the Susse Chalet in Smithfield in Silas's truck. On the way, the two men stopped at a gas station to buy chips, soft drinks, and cigarettes. He said that while they were in the truck, returning to the motel, he and Silas spoke about defendant. He said that Silas was not concerned, but that he, himself, worried that Linde might start trouble again. Therefore, he scanned the area around the motel when they drove into the parking lot, and parked in a space under a streetlight next to a pickup truck.

Mosley testified that when Silas got out of the truck, he grabbed his grocery bag and another green bag and instructed Mosley to retrieve a black bag from the lock box on the truck's passenger side.[FN5] Mosley said that he carried this bag and his groceries when he passed around the side of the truck and saw defendant standing in an area behind the truck, about eight or ten feet away. The defendant was bent over at the waist, with both hands behind his knee, wearing an unbuttoned denim shirt that hung down by his side and concealed his hands. Mosley said that Silas was standing just a few feet behind defendant in a grassy area, staring at him. Seeing defendant in this position gave Mosley an uneasy feeling, and he said he told defendant, “Damn, it ain't that bad, is it?” The defendant mumbled something in response and got up, pointing the gun directly at Mosley. As soon as he saw the gun, Mosley ran around the front of the pickup truck parked next to Silas's truck, jumping behind it, when he heard a gunshot. Running a few steps further, he testified, he heard another gunshot. Mosley then ran across the parking lot to seek cover in the darkness of nearby trees. While seeking cover, Mosley carried with him a bag of chips, a soda bottle, Silas's black bag, and his coat. Mosley testified that while he was running, he turned around to see whether Linde was following him. He saw defendant walking toward and entering the motel through a side ***1123** door. From his position among the trees, Mosley said, he then called out for Silas without receiving an answer. He then ran back across the parking lot and found Silas lying on the ground behind the truck. When he returned to Silas, he left the black bag and his coat in the woods, where he retrieved them the next morning, while he carried the chips and soda with him and placed them in the back of the truck.[FN6] Mosley said that Silas was unresponsive and that he called 9-1-1 on his cellular phone. While he was still speaking on the phone, he testified, another man walked over to him, saying the man with the gun was inside the motel. He then saw an elderly couple leave the motel and drive off. Mosley also testified that he heard more gunshots before he saw Linde approach the parking lot from the front of the motel. Mosley then, again, sought cover in the shadows. Mosley saw defendant walk past

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Silas, who was on the ground, and disappear into the woods, just before a police car approached.

FN5. The police later removed a .357-caliber handgun from the green bag after seeing its butt end sticking out of the bag.

FN6. The police never retrieved the black bag in question.

The man who approached Mosley while he was attending to Silas was Richard Amon, a truck driver for the Old Dominion Freight Line. He testified at trial that, he was in the lobby of the Susse Chalet in Smithfield shortly after 10 p.m. on October 23, 2001. The motel clerk was checking him in at the counter when defendant approached him on his right, pushed him really hard, and pointed a gun at his head. Amon testified that when defendant told him to "get the * * * out of there," he left through the side door through which defendant had just entered the lobby. He said that after he exited into the parking lot, he saw Mosley with a cellular phone and approached him to have him call the police. At that moment he saw Silas on the ground gasping, his eyes fluttering, and heard Mosley convey information about the event on the phone. Amon testified that he then heard two gunshots from the direction of the checkout area. He said he thought that defendant was coming back, and sought cover and waited until everything was clear.

The clerk of the Susse Chalet in Smithfield, Frank Parrillo, confirmed in his testimony the event in the motel lobby. He observed how defendant held a gun to Amon's head and ordered him to leave the lobby. He further said that after Amon had left, defendant pointed the gun at him without saying anything. When defendant averted his gaze for a moment, Parrillo ran into the back office, locked the door, and called 9-1-1. Parrillo remained in the office for four or five minutes. During this time, he heard voices and three or four gunshots emanating from outside.

Another person who encountered defendant was Robert Loya, a business consultant from Maryland. He testified that at about 10:15 on the night in question, he was standing in the parking area near the entrance to the lobby of the Susse Chalet, after he had just checked into the motel. He was talking to a woman, when defendant came running out the door with a gun in his hands, very mad and yelling that he had just killed someone and was out to kill someone else sent after him. Loya stated that defendant then fired one shot in the ground and another one in the air. After firing a third shot in the ground, Loya said, defendant waved the gun around in the direction of him and the woman, pointing it at him at some point. Loya said that defendant mentioned that he had injured his knee on the job. Loya asked how it had happened. He mentioned that defendant calmed down as a result of the conversation. After approximately two minutes, defendant walked over to him, ***1124** apologized, and handed him the gun before limping off into the woods across from the motel. The witness said that a few minutes later, several police cars arrived, and he handed the gun to one of the police officers.

The defendant was arrested by police in the parking lot of a CVS building not far from the Susse Chalet at around 2:50 a.m. on October 24, 2001. Shortly thereafter Officer St. Angelo, who had reported to the Susse Chalet earlier in the day, arrived and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

identified Linde as the same man she had seen before. She then took defendant to the Smithfield police station in her cruiser. Silas died at the scene from a single gunshot wound in the chest.

## II

### A. Motion to Suppress

Before the trial commenced, the trial justice held a suppression hearing concerning the admissibility of a gun holster that was found during a search of defendant's motel room. Two detectives of the Smithfield Police Department conducted the search under the written consent of Shane Roberts, defendant's roommate at the motel. The defendant did not dispute that the consent was obtained lawfully from Mr. Roberts. He objected, however, to the gun holster's admission into evidence because it was found under the mattress in the bed on which he slept at the motel. The defendant argued that his roommate's consent could not extend to his bed, an area that he obviously intended to be private by secreting the holster between the mattress and box spring. The trial justice, however, denied defendant's motion to suppress the holster. As a result, one of the police detectives testified at trial that he found the holster when he lifted the corner of the mattress, at which time the holster fell to the floor. He said that he did not see the holster before lifting the mattress, but that he assumed it was located right at the edge. The detective also said that he did not learn until after the discovery that the bed where the holster was found was the bed defendant used.

On appeal, defendant argues that the trial justice erred when he denied defendant's motion to suppress the gun holster because the roommate's consent to search the motel room could not extend to defendant's bed, in which he held a privacy interest.

### B. Admissibility of the Gun Holster

[1][2] "In reviewing the trial justice's denial of defendant's motion to suppress the incriminating * * * evidence, we defer to the factual findings of the trial justice, applying a 'clearly erroneous' standard." *State v. Apalakis*, 797 A.2d 440, 443 (R.I.2002) (quoting *State v. Page*, 709 A.2d 1042, 1044 (R.I.1998)). "With respect to questions of law and mixed questions of law and fact involving constitutional issues, however, this Court engages in a *de novo* review in accordance with *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911." *Apalakis*, 797 A.2d at 443. The First Circuit Court of Appeals has held that it "review[s] the legal determination of whether a third party had authority to consent to a search *de novo*." *United States v. Salimonu*, 182 F.3d 63, 70 (1st Cir.1999).

[3][4] "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (citing *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)). "Moreover, [o]vernight guests and joint occupants of motel rooms ***1125** possess reasonable expectations of privacy in the property on which they are staying." *United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir.2004) (citing *Minnesota v. Carter*, 525 U.S. 83, 89-90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998); *Stoner v. California*, 376 U.S. 483, 489-90, 84 S.Ct.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

889, 11 L.Ed.2d 856 (1964)).

[5][6][7][8] "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "The [Fourth Amendment] prohibition does not apply, * * * to situations in which voluntary consent has been obtained, either from the individual whose property is searched * * * or from a third party who possesses common authority over the premises." *Rodriguez,* 497 U.S. at 181, 110 S.Ct. 2793. "A third party's consent to search is valid if that person has either the 'actual authority' or the 'apparent authority' to consent to a search of that property." *Kimoana,* 383 F.3d at 1221 (quoting *United States v. Gutierrez-Hermosillo,* 142 F.3d 1225, 1230 (10th Cir.1998)). The burden of establishing common authority and the effectiveness of a third party's consent rests upon the state. *Rodriguez,* 497 U.S. at 181, 110 S.Ct. 2793. We have held before that "[t]he doctrine that recognizes the validity of third party consent to a search must be applied cautiously to prevent erosion of Fourth Amendment protections." *State v. Farrell,* 443 A.2d 438, 442 (R.I.1982).

In the present case, defendant does not generally challenge the written consent given by his roommate, Shane Roberts, to search their mutual room at the Susse Chalet Motel in Smithfield. He argues, however, that Roberts's ability to consent extended only to the "common areas" of the motel room and did not include defendant's bed. This case, therefore, raises the question whether defendant possessed a privacy interest in his motel room bed that went beyond the scope of his roommate's consent. Said differently, did the roommate's ability to consent to the search of the motel room extend to defendant's bed?

[9][10] With regard to actual authority, the United States Supreme Court said, in *Matlock,* that the "consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock,* 415 U.S. 164, 170, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Common authority rests on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7, 94 S.Ct. 988; *see also State v. Hightower,* 661 A.2d 948, 960 (R.I.1995); *Farrell,* 443 A.2d at 441.[FN7]

FN7. Absent such actual authority, a warrantless search based on third-party consent will be upheld if it falls under the "apparent authority" exception. "[T]he Fourth Amendment is not violated when officers enter without a warrant when they reasonably, although erroneously, believe that the person who consents to their entry has the authority to consent to this entry." *United States v. Gutierrez-Hermosillo,* 142 F.3d 1225, 1230 (10th Cir.1998) (citing *Illinois v. Rodriguez,* 497 U.S. 177, 185-89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). The standard for deciding the reasonableness of the officers' belief is an objective one: "[W]ould

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> the facts available to the officer at the moment * * * 'warrant a [person] of reasonable caution in the belief' that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 188, 110 S.Ct. 2793 (citing *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

***1126** It is undisputed that Shane Roberts had actual authority to consent to a search of the motel room because he and defendant had "shared use and joint access to or control over" the shared area. *See United States v. Welch*, 4 F.3d 761, 764 (9th Cir.1993) (citing *United States v. Salinas-Cano*, 959 F.2d 861, 864 (10th Cir.1992)); *see Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988.[FN8] In *Kimoana*, the Tenth Circuit Court of Appeals determined that a person who was not the registered guest at the motel and had not paid for it, but had stayed in the room overnight, left his possessions there and carried a key to the room, had joint access and control over the room and thus had actual authority to consent to its search. *Kimoana*, 383 F.3d at 1222. Furthermore, in *Welch*, the Ninth Circuit Court of Appeals held that a defendant who had shared access to, and use of, a rental car had partly relinquished her expectation of privacy in the vehicle, and that her Fourth Amendment interest in the car could be waived by the co-renter's voluntary consent. *Welch*, 4 F.3d at 764. Likewise, defendant partly relinquished his privacy interest in the motel room by sharing it with Shane Roberts over the course of several weeks in the fall of 2001.

> FN8. The fact that neither defendant nor Roberts paid for the motel room, but that, instead, the bill was paid by their employer, should not affect the consent at issue in this case. The United States Supreme Court held that "[c]ommon authority is * * * not to be implied from the mere property interest a third party has in the property." *United States v. Matlock*, 415 U.S. 164, 171n, 94 S.Ct. 988, 39 L.Ed.2d 242.7 (1974).

However, some courts have held that "[t]he shared control of a 'host' property does not serve to forfeit the expectation of privacy in containers within that property." *Welch*, 4 F.3d at 764 (citing *United States v. Karo*, 468 U.S. 705, 725-27, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (O'Connor, J., concurring)). In *Welch*, the court held that although the defendant had relinquished her expectation of privacy in the car, this did not apply to her purse inside the car. *Id.* The court said that "the government must show shared control with respect to the purse as well as with respect to the vehicle if it is to prevail on a mutual use and joint control theory." *Id.* Likewise, in *State v. Evans*, 45 Haw. 622, 372 P.2d 365 (1962), a case decided on state constitutional grounds, the Hawaii Supreme Court held that the wife's authority to consent to a search of the joint home did not extend to a cuff link case, clearly identifiable as the husband's, which was in the joint bedroom. *Id.* at 372.

Conversely, the Fifth Circuit Court of Appeals upheld the search of a motel room consented to by the defendant's girlfriend, who had been staying in the room with him for several days. *United States v. Richard*, 994 F.2d 244 (5th Cir.1993). In addition, the court found that her authority to consent extended to empty suitcases, trash bags, and dryer sheets in the room and seized during the search because no evidence had been presented showing that the defendant had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

limited his girlfriend's access to these items. *Id.* at 250. In *Dupont v. United States,* 259 A.2d 355 (D.C.1969) the court held that an apartment owner could give valid consent to a search of her apartment, including the bed that the defendant had used and where he had hidden a gun. *Id.* at 357. The court held that her consent was "directed to a part of the apartment not reserved for [defendant's] sole personal use, unlike [a] bureau * * * or [a] closet * * *," *id.* at 357-58, because there was evidence that the bed was used by the apartment owner's***1127** friends on a "first-come, first-serve basis." *Id.* at 358 n.2.

The main difference between these two strands of cases is that those in which the search was held to be unconstitutional on state or federal law grounds involved evidence seized from closed or locked containers or items reserved for the sole personal use of the defendants and over which they had not relinquished their sole control. The third parties' authority did not extend so far as to override this greater privacy interest and, therefore, these searches were deemed impermissible. In those cases, however, when the defendants were not able to demonstrate that they somehow limited the third party's access to an item of property, the consenting third party's authority extends to all items on the premises. *See, e.g., Richard,* 994 F.2d at 250.

[11] A motel room bed is clearly distinct from a locked safe, a personal suitcase, or other closed container of personal property. The room at issue here was a typical one-room motel room with two beds separated by a nightstand, and an adjacent bathroom. Clearly, Mr. Roberts had common authority and control over the room itself, and there is no evidence that any part of the room was reserved for defendant's sole personal use. Indeed, Mr. Roberts did have the authority, at least when defendant was not in the room, to place items, to sit, or allow others to sit, on the bed in which defendant slept. Addressing the issue in a somewhat different way, the bed-like a purse contained in a car-is a separate item in which defendant *may* have had a separate, independent expectation of privacy relative to the rest of the motel room. The burden of demonstrating this independent expectation of privacy is on defendant. *See Richard,* 994 F.2d at 250; *see also State v. Verrecchia,* 766 A.2d 377, 382 (R.I.2001) ("To contest * * * a seizure of evidence as unlawful, * * * the defendant must have enjoyed a reasonable expectation of privacy in the premises or property that was the subject of the search * * * [and bears] the burden of proving that his alleged expectation of privacy was one that society would be willing to recognize as objectively reasonable."). "To determine whether a person's asserted privacy expectation was objectively reasonable, we have examined, among other factors, whether the suspect possessed or owned the area searched or the property seized; his or her prior use of the area searched or the property seized; the person's ability to control or exclude others' use of the property; and the person's legitimate presence in the area searched." *Verrecchia,* 766 A.2d at 382. The defendant has not demonstrated any factors that would support a greater expectation of privacy in the bed vis-à-vis the rest of the motel room-he did not have exclusive use of the bed nor the ability to exclude his roommate from using the bed.

Under these circumstances, we conclude that Mr. Roberts had sufficient authority to consent to a search of all areas of the motel room in which he exercised common

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

authority and control over, including defendant's bed. Therefore, we do not find error in the trial justice's denial of defendant's motion to suppress.

### III

### A. Trial Justice's Failure to Instruct on Self-Defense

In his second argument on appeal, defendant argues that the trial justice committed error when he refused to instruct the jury on self-defense. During the trial, before the final charge to the jury, defendant's counsel requested an instruction on self-defense. The defendant's attorney remarked that there was some evidence of ***1128** self-defense and that, although it did not "rise to a great level," it required the trial justice to give such an instruction. He explained that the act of self-defense in this case was not the shooting of Silas, but only the act of pulling the gun from the waistband and cocking it. In opposing this motion, the state argued that the evidence presented in this case did not rise to the level that would require a jury instruction on self-defense and that such an instruction would, indeed, only confuse the jury. The trial justice responded to defendant's request for a self-defense instruction by saying:

"There is no evidence of self-defense in this case. Similarly, it is not sufficient enough to rise to a level that would invite an instruction * * *, but really it sounds like an [imperfect] self-defense theory, which our Court on a number of occasions, certainly most recently in [*State v. Catalano*, 750 A.2d 426 (R.I.2000) and *State v. Wright*, 558 A.2d 946 (R.I.1989)] indicated [imperfect] self-defense is not available in the State of Rhode Island, but beyond that, I just don't see any self-defense evidence in any way would be sufficient such that it would invite such an instruction. But by defendant's own testimony, he had certainly argued himself well before Silas and Mosley returned to the hotel, Mosley got out of the truck, he had no harsh, violent words with the defendant. The only thing I think the defendant related was that Mosley made some sarcastic remark, 'it could have been your neck.' Beyond that, there was no physical altercation whatsoever. There were no fighting words, so to speak, uttered by Mosley. Mosley didn't do anything. He didn't raise a weapon, didn't even raise a fist. There is no evidence of self-defense to my knowledge * * *."

Accordingly, the trial justice did not instruct the jury on self-defense with regard to the assault on Daniel Mosley. With regard to the killing of Silas, however, the trial justice instructed the jury on first-and second-degree murder, as well as manslaughter. The trial justice also told the jury that they could not find defendant guilty of manslaughter or murder if they found that Silas's death had been an accident. Subsequently, the jury found defendant guilty of second-degree murder of Silas and of assault with intent to murder Mosley.

On appeal, defendant argues that the trial justice erred when he refused to instruct the jury on self-defense with regard to the assault on Mosley. The defendant asserts that although the doctrine of imperfect self-defense, which reduces the crime of murder to voluntary manslaughter, is not available in Rhode Island, an instruction on self-defense with regard to the assault still was necessary to support defendant's "defense theory of accident as to the murder charge itself." Instead of arguing for imperfect self-defense, defendant views this as a case

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of "self-defense gone bad."

### B. Standard of Review

[12][13][14][15] It is well established that "[t]he charge given by a trial justice need only 'adequately cover [] the law.' " *State v. Lynch*, 854 A.2d 1022, 1044 (R.I.2004) (quoting *State v. Hazard*, 797 A.2d 448, 469 (R.I.2002)). " 'On review, [this Court] examine[s] the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them * * *.' " *Id.* "[W]e shall affirm a trial justice's jury instructions when * * * the instructions adequately cover the law and neither reduce nor shift the state's burden of proof." *State v. Keiser*, 796 A.2d 471, 472 (R.I.2002) (mem.) (citing *State v. Marini*, 638 A.2d 507, 517 (R.I.1994)). "As long as the ***1129** trial justice's general charge has fairly covered a requested charge for jury instructions, his refusal to grant the requested charge is not reversible error." *State v. Turner*, 746 A.2d 700, 703 (R.I.2000) (citing *State v. Price*, 706 A.2d 929, 934 (R.I.1998)).

### C. No Evidence of Self-Defense

[16][17][18][19] The defendant's assertion of error concerning the trial justice's refusal to instruct the jury on self-defense is directed solely at the charge of assault with intent to murder Daniel Mosley. The defendant does not claim self-defense with respect to the killing of Silas; the act of shooting, he posits, was accidental. He contends, rather, that he was not able to take full advantage of his defense that the killing of Silas was an accident because of the missing instruction on self-defense.

"Under the law relating to self-defense, one may defend oneself whenever one reasonably believes that he or she is in imminent danger of bodily harm at the hands of another. Such a person, having the fear, need not wait for the other to strike the first blow. However, such a person must use only such force as is reasonably necessary for his own protection. The permissible degree of force used in defense of oneself varies with the particular set of circumstances in which he or she acts, but in no set of circumstances may one apply more than that degree of force necessary to prevent bodily injury." *State v. D'Amario*, 568 A.2d 1383, 1385 (R.I.1990).

"However, when deadly force is involved, 'individuals [who are] attacked must attempt to retreat if they are consciously aware of an open, safe and available avenue of escape.' " *State v. Silvia*, 836 A.2d 197, 200 (R.I.2003) (quoting *State v. Rieger*, 763 A.2d 997, 1003 (R.I.2001)).

[20] It is well established that this Court does not recognize the doctrine of imperfect self-defense. *State v. Catalano*, 750 A.2d 426, 429 (R.I.2000). Where available, the doctrine of imperfect self-defense "purports to reduce the crime of murder to voluntary manslaughter." *Id.* It is based on the underlying theory that "when a defendant uses deadly force with an honest but unreasonable belief that it is necessary to defend himself, the element of malice, necessary for a murder conviction, is lacking." *Id.*

In the case before us, the trial justice did, however, instruct the jury on the defense of accident with regard to the killing of Silas. He informed the jury that "if you find that the defendant caused Randy Silas' death, but that he did so unintentionally and accidentally, and without having acted recklessly, then you must find him not guilty

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of manslaughter or murder." The jury, however, rejected this defense and found defendant guilty of murder in the second degree.

As we have held with regard to curative instructions given by a trial justice, "the entire rationale underlying the structure of jury trials and the lyrical deference that is paid to jury findings rests upon the proposition that jurors will obey * * * the trial justice and will apply the law as given to them by the justice presiding." *State v. Fenner*, 503 A.2d 518, 522 (R.I.1986). We have no reason to assume that the jury did not give full consideration to the trial justice's instruction concerning the defense of accident when it found defendant guilty of murder in the second degree for killing Silas. Moreover, defendant does not challenge the adequacy of the trial justice's accident instruction with regard to the Silas killing. Therefore, we must reject defendant's argument that he was unable to fully take advantage of his defense that the shooting was accidental. We also decline ***1130** to open a back door to the doctrine of imperfect self-defense, which this Court repeatedly has held not to be available in Rhode Island. *See* *Catalano*, 750 A.2d at 429.

[21] This leaves for us to decide the question whether the trial justice erred in declining to instruct the jury on self-defense solely concerning the charge of assault with intent to murder Daniel Mosley. The defendant argues that he acted in self-defense toward Mosley when he pulled a gun from his waist and cocked it.

[22][23] It is well established that a trial justice must instruct the jury on self-defense regardless of how "slight and tenuous the evidence may be on which the self-defense hypothesis is advanced." *State v. Butler*, 107 R.I. 489, 496, 268 A.2d 433, 436 (1970). Indeed, "individuals believing that they are in imminent peril of bodily harm can use such nondeadly force as is reasonably necessary in the circumstances to protect themselves." *State v. Martinez*, 652 A.2d 958, 961 (R.I.1995) (citing *State v. Fetzik*, 577 A.2d 990 (R.I.1990); *State v. Quarles*, 504 A.2d 473 (R.I.1986); *State v. Tribble*, 428 A.2d 1079 (R.I.1981)). However, we also have observed that "one may not invoke the doctrine of self-defense if he or she has instigated the combative confrontation." *Martinez*, 652 A.2d at 961 (quoting *State v. Lamoureux*, 573 A.2d 1176, 1180 (R.I.1990)). "Self-defense is grounded on necessity, and one cannot provoke a difficulty, thus creating the necessity, and then justify the resulting homicide or injury as an act of necessity and self-defense." *State v. Guillemet*, 430 A.2d 1066, 1069 (R.I.1981).

Even if we view the evidence in the case now before us in the light most favorable to Linde, *see* *Guillemet*, 430 A.2d at 1069, we find no evidence that he acted in self-defense when he pulled out the gun and cocked it. Linde testified at trial that he stepped outside into the motel's parking lot carrying a loaded gun to prevent Mosley from "jump[ing]" on him again and injuring his other knee. He further said that he saw Mosley come around the truck and throw a black bag in the back of the truck, which he "figured" might contain Silas's weapons. According to defendant, Mosley told him that "it could have been [his] neck," followed by a statement about a gun. Linde then testified, "I figured he might be going around with the gun in that bag so I pulled that gun and I cocked it and when I cocked it, I almost dropped it. When I gained control of it again, I grabbed it, and a round

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

shot off."

We agree with the trial justice's assessment that "[t]here is no evidence of self-defense in this case," and we are satisfied that the trial justice properly declined to instruct on self-defense. The evidence does not give rise to the inference that defendant had reason to believe that he was in imminent peril of bodily harm. There is no suggestion that Mosley had any weapon in his hand, nor that he was in any way acting aggressively toward Linde. Even if defendant construed Mosley's remarks as threatening, they do not support his assertion that he was in fear of bodily harm.

The gun that he "figured" might be in the bag that Mosley had been carrying would have been, at the time, still in the bag sitting in the back of the truck. Furthermore, there is not one scintilla of evidence that defendant, who was standing in a motel parking lot at 10 p.m. in close proximity to a wooded area, ever made any attempt to retreat. Even if we were to credit defendant's contention that he was entitled to use some measure of force in response to Mosley's "provocation," we are satisfied that drawing a loaded handgun and cocking it so precipitously gave rise to the likelihood of deadly force that defendant***1131** was required to attempt a retreat if he was aware of an available avenue of escape. In *Guillemet,* we held that it was not error for the trial justice to refuse to give a self-defense instruction when the defendant appeared with a loaded weapon on the victim's doorstep and "made no effort whatsoever to avoid the combat or to attempt retreat." *Guillemet,* 430 A.2d at 1069.

Moreover, the evidence confirms that Linde instigated the confrontation by stepping into the parking lot carrying a loaded weapon and by approaching Mosley with it to prevent him from "jump[ing] on [him] again." To avoid another confrontation with Mosley, defendant simply could have remained in his motel room. Even if he was urgently waiting for someone to drive him to a hospital, he could have waited in his room for the arrival of his roommate Shane Roberts and his son, whom he expected to return around the same time as Mosley and Silas. *See* *Martinez,* 652 A.2d at 961 (upholding the trial justice's refusal to give a self-defense instruction when there was no evidence that the defendant "acted in a self-defensive posture" or that "he was in fear of his life and was justified in using deadly force[,]" and stating that "one may not invoke the doctrine of self-defense if he or she has instigated the combative confrontation").

Accordingly, the trial justice did not err by refusing to instruct the jury on self-defense with regard to the assault with intent to kill Daniel Mosley.

## Conclusion

For the reasons stated herein, the judgment of conviction is affirmed and the record in this case is remanded to the Superior Court.

R.I.,2005.
State v. Linde
876 A.2d 1115

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.